**AMERICAN CAPITAL CORPORATION and Transcapital Financial Corporation, Plaintiffs,**

and

**Federal Deposit Insurance Corporation, As Successor to the Rights of the Transohio Savings Bank, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

**No. 95–523C.**

United States Court of Federal Claims.

Feb. 27, 2004.

Charles J. Cooper and Vincent J. Colatriano, Washington, D.C., for plaintiffs.

Jane Margaret Ellen Peterson, Washington, D.C., for defendant, United States Department of Justice.

Andrew Charles Gilbert, Washington, D.C., for plaintiff-intervenor, Federal Deposit Insurance Corporation.

## MEMORANDUM OPINION REGARDING PARTIAL SUMMARY JUDGMENT AS TO DAMAGES

BRADEN, Judge.

Justice Holmes observed, "[W]hen people make contracts, they usually contemplate the performance rather than the breach." OLIVER WENDELL HOLMES, THE COMMON LAW 302 (1881). Accordingly, when a breach does occur, the law allows the courts to award damages to encourage promisees to rely on promisors and thereby shift reasonable business risks to the party promising performance.

> Our system of contract remedies is not directed at *compulsion* of *promisors* to *prevent* breach; it is aimed, instead, at *relief* to *promisees* to *redress* breach. Its preoccupation is not with the question: how can promisors be made to keep their promises? Its concern is with a different question: how can people be encouraged to deal with those who make promises?

E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS ("FARNSWORTH") at § 12.1 (3d ed.2004).

The Supreme Court answered that question in *United States v. Winstar*, 518 U.S. 839, 881, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) explaining that, "The contracts [in this case] have been read as solely risk-shifting agreements and respondents seek nothing more than the benefit of promises by the Government to ensure them against any losses arising from future regulatory change." Accordingly, the Supreme Court emphatically stated: "[W]e ... reject the suggestion that the Government may simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such change." *Id.* at 883, 116 S.Ct. 2432.

The United States Court of Federal Claims concurs. The Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC"), (collectively hereinafter referred to as "the Government"), having assumed the contractual risk of a breach caused by regulatory change, in this case, is liable for damages to protect plaintiffs' reliance interest for the reasons discussed herein. *See* RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT") at §§ 158(2), 272(2) (providing that a court may "grant relief on such terms as justice requires including protection of the parties' reliance interests.").

### RELEVANT FACTS [1]

On August 21, 1986, the FHLBB declared Citizens Federal Savings and Loan Associa-

---

1. *See American Capital Corp. v. United States*, 58 Fed.Cl. 398 (2003) (*"American Capital I"*). Other relevant facts recited herein were derived from the following portions of the record: Plaintiffs' October 10, 2000 Appendix on Liability ("Pl.App. on Liability"); Plaintiffs' August 31, 2001 Appendix on Damages ("Pl.App. on Damages"); Defendant's December 18, 2000 Appendix on Liability ("Def.App. on Liability"); Defendant's November 30, 2001 Appendix on Damages ("Def.App. on Damages"); Defendant's June 5, 2003 Appendix on Damages ("Def.App. on Dam-

ages II"); and Plaintiffs' February 13, 2004 Post-Hearing Appendix ("Pl. P. H.App.").

Citations to other references herein include: Federal Deposit Insurance Corporation's March 25, 1997 Complaint ("FDIC Compl."); Plaintiffs' August 31, 2001 Motion for Partial Summary Judgment With Respect to Damages ("Pl.Mot. P.S. J."); Defendant's November 30, 2001 Response in Opposition ("Def.Resp."); Plaintiff Federal Deposit Insurance Corporation's November 30, 2001 Motion for Partial Summary Judgment and Opposition to Shareholders' Motion for Partial Summary Judgment on Damages ("FDIC

tion of Cleveland, Ohio ("Citizens"), a federally chartered, FSLIC-insured thrift institution, insolvent. *See* Pl. App on Liability at 14–25. Citizens' assets were estimated at $430 million with $520 million in liabilities. *See* Def.App. on Damages II at 74. FSLIC estimated that a liquidation of Citizens would cost the Government $131 million. *Id.* at 385–86. The same day, the FHLBB also declared Dollar Savings Bank of Columbus, Ohio ("Dollar"), an Ohio chartered FSLIC-insured mutual savings bank, insolvent. *See* Pl.App. on Liability at 14–25. Dollar's assets were estimated at $335 million with $375 million in liabilities. *See* Def.App. on Damages II at 74. The FSLIC estimated that a liquidation of Dollar would cost the Government $52.5 million. *Id.* at 386.

Transohio Savings Bank, FSB ("Transohio Savings") was a federally chartered stock savings and loan association insured by FSLIC. *See* Pl.App. on Liability at 26–203. Transohio Savings was controlled by American Capital Corporation ("AMCAP"), through its wholly owned subsidiary, First Global Investors, Inc., which owned 50.8 percent of the common stock of Transohio Financial Corporation ("TFC"), which in turn owned 100 percent of the stock of Transohio Savings. *See* Pl.App. on Damages at 518. On June 30, 1985, Transohio Savings had $2.9 billion in assets, shareholder equity of $101.4 million, and was the largest savings institution in Ohio, based on total assets. *See* Pl.App. on Liability at 152.

On or about May 2, 1986, AMCAP's 1985 Annual Report was filed reporting:

> In June 1985, the Company received net proceeds of approximately $75 million through the issuance of Units consisting of an aggregate of $80 million principal amount of Notes and 14,960,000 Warrants in a public offering.... As a condition to incurring the indebtedness relating to the Units offering, *the Company agreed not to use the proceeds of the Units offering with-* *out the approval of the [FHLBB].* The Company invested $20 million of the proceeds of the Units offering in 13% Convertible Subordinated Notes of Transohio. *The Company intends to invest approximately $45 million of the remaining proceeds in subordinated notes and additional Transohio common stock to be issued in connection with a proposed rights offering by Transohio.*

Pl.App. on Damages at 537 (emphasis added).

On May 30, 1986, the FHLBB Office of Supervisory Agent in Cincinnati provided the FHLBB Assistant Director for Regional Operations in Washington, D.C. with an analysis of the proposed acquisition of Citizens and Dollar by AMCAP and TFC (hereinafter "plaintiffs") and related companies. *See* Pl. App. on Liability at 302–11. Approval of the proposed acquisition was recommended, but it was suggested the FHLBB's approval be made contingent upon several conditions being fulfilled, first among which was: "[Plaintiffs] shall stipulate to the FSLIC that it will cause the net worth of the surviving insured institution to be maintained at a level consistent with the requirements of Section 563.13(b) of the Rules and Regulations for Insurance of Accounts,[2] as now or hereafter in effect, and, *as necessary, will infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.*" Pl. App. on Liability at 310 (emphasis added).

On June 19, 1986, the FHLBB again was advised of plaintiffs' intent to provide $45 million to Transohio Savings from a Transohio Rights Offering, which was planned to be in place at the time the requisite regulatory approvals were completed, but prior to the closing of the Transohio merger with Citizens and Dollar. *See* Pl.App. on Damages at 641; Pl. P.H.App. at 857–58 (Exhibit 6 to Aug. 23, 2000 Dep. of Lawrence B. Muldoon,

---

Mot. P.S.J. on Damages"); Plaintiffs' February 8, 2002 Combined Reply ("Pl.Com.Reply"); Defendant's January 5, 2004 Cross–Motion for Summary Judgment Upon Plaintiffs' Claims for Restitution ("Def.Cross–Mot."); Plaintiffs' February 13, 2004 Post–Hearing Brief ("Pl.P.H. Brief"); Defendant's February 13, 2004 Response to

Court Order Dated January 13, 2004 ("Def.P.H. Brief"); Plaintiff's Supplemental Post–Hearing Brief of Plaintiff–Intervenor Federal Deposit Insurance Corporation Pursuant to Court's Order of January 13, 2004 ("FDIC P.H. Brief").

**2.** *See* 12 C.F.R. § 563.13(b) (1986).

FHLBB Supervisory Agent–June 19, 1986 letter from Jack D. Burstein, CEO of TFC to Laurence Muldoon). Mr. Muldoon's deposition testimony and the June 19, 1986 letter indicate that there had been extensive prior communications between plaintiffs and the FHLBB about the terms of the proposed $45 million "Transohio Rights Offering," prior to June 19, 1986, and that TFC was frustrated by the pace of regulatory review and how it was adversely impacting implementation of the Citizens/Dollar closing and the rights offering. *See* Pl. P.H.App. at 857–58. Because of the import of this document to the court's rulings, TFC's CEO's letter to the FHLBB is set forth herein in its entirety:

June 19, 1986

Mr. Lawrence B. Muldoon

Federal Home Loan Bank of Cincinnati

2000 Atrium II

221 East Fourth Street

Cincinnati, Ohio 45201

Dear Larry:

I would like to take the opportunity to summarize the impact that the delay of the Transohio Rights Offering has had on our companies. As you know, American Capital designed this financing to supplement the capitalization of Transohio. While the coupon cost was relatively palatable, the total cost after taking into account the warrants given was in excess of 16% to American Capital. *We have been required by the approval order to keep the proceeds from the unit offering invested in short term U.S. Government funds* during a time when interest rates have fallen over four hundred basis points. In connection with the Rights Offering, we had anticipated a yield to American Capital of approximately 15% through a combination of coupon yield together with the impact of the additional equity in Transohio's earnings. Instead, our average return on these funds is currently around 6.5% and accordingly, the income loss to American Capital is in excess of $3 million on an annualized basis. Of greater cost to American Capital has been the change in Transohio's stock price during the period. *We believe that investor recognition of American Capital's support, including an intention to commit $45 million of additional capital in Transohio has been a direct contributor to a rise in stock prices from the approximate $12 per share level at the time the Rights Offering was proposed to the current trading price in the $17 range.* Therefore less stock will be available to American Capital which has resulted in a direct loss of $14,000,000 (which, since it relates to stock values, would represent no cost to Transohio).

Secondly, at the American Capital level we have worked very hard and have been very successful in maintaining a high profile in the investment community and we view American Capital as a conduit for additional capital funding into the thrift industry. This could have profound benefits for not only Transohio but other thrifts in need of capital and should be a very positive situation. However, it is necessary for us to demonstrate that the regulatory process is manageable and supportive of these activities to continue to maintain investor interest. If investors perceive the ability to deploy funds in a satisfactory manner is uncertain, such funds will not be available either to American Capital or the industry in general.

At the Transohio level there are some further very specific costs to the delays. We believe, as I think the Federal Home Loan Bank system in general believes, that capitalization is integral to the long term success of any financial institution. Along these lines, the capital contribution to Transohio Savings contemplated by the Rights Offering would put our organization in a favorable position to respond if the proposed regulations to increase capital requirements are enacted. Our position has been to maintain capital levels in excess of regulatory minimums in order to allow us to take operating hits which enable restructuring, deal with interest rate cycles, take advantage of acquisition opportunities and achieve a reasonable growth rate. Lack of capital can result in undue risk and ultimately failure to provide adequate financial services to the communities involved.

*In connection with the two pending acquisitions in which Transohio is involved, we*

*had contemplated that this Rights Offering would be in place prior to closing.* The asset increase in addition to our restructuring objectives highlight this need.

One of the most attractive features of our Rights Offering is that it enables Transohio Savings to raise capital at interest rates significantly below market rates due to the equity inducement provided by the parent. Therefore, Transohio Savings would receive funds with a 12% coupon when market rates at the time were 15% (the Bank Board was approving numerous transactions at this cost level since all thrifts nationwide were experiencing this cost of capital). While rates have since declined, the pricing is still significantly better than market rates for subordinated debt.

Larry, I have tried to touch on not only the individual problems which have arisen due to the Rights Offering delays but the pervasive implications that this kind of experience can have. It is our desire to make a contribution to Transohio and the thrift industry and to improve the safety and soundness of the system. Unfortunately, the result has been the opposite in that we have been faced with negative economic consequences; have had to deal with uncertainty in reporting to our managers, directors, and potential investors; and signals that have been received have not been positive.

I appreciate your personal efforts to get this matter resolved and I am confident that it can be overcome.

Very truly yours,

Jack D. Burstein

Pl. P.H.App. at 857–58 (emphasis added).

By June 1986, Transohio Savings had increased its total assets to $3.5 billion and had a regulatory net worth of 3.5 percent. *See* Pl.App. on Liability at 333–34.

Although the precise date that the Transohio Rights Offering and amount thereof was first known by the FHLBB cannot be ascertained from the appendix documents, it is clear that date was sometime in 1985, before the AMCAP's Units Offering took place. *See* Pl. P.H.App. at 807–58. The record also

reflects that the FHLBB conditioned this offering through an "approval order." *See* Pl. P.H.App. at 857. In any event, all of this took place well over a year before August 29, 1986, when the Transohio merger with Citizens and Dollar finally was approved by the regulators—and, by which time the Government had actual knowledge of and expected that an additional $45 million in capital would be provided to effectuate that transaction. *See* Pl.App. on Damages at 537, 641–44; *see also* Pl. P.H.App. at 727–28, 753–806 (evidencing that the 1985 AMCAP Annual Report was provided to the FSLIC on May 2, 1986 as an exhibit to Plaintiffs' Application H-(e)3 concerning the proposed Citizens/Dollar acquisition); Pl. P.H.App. at 857–58.

On August 21, 1986, the FHLBB issued Resolution No. 86–864 conditionally approving a proposed Assistance Agreement between plaintiffs, Transohio Savings, and the FHLBB. *See* Pl.App. on Liability at 14–23. At that time, Transohio had a regulatory net worth of $132.2 million on liabilities of $3.4 billion or approximately 3.85 percent, which was $29.1 million in excess of the regulatory requirement. See Pl.App. on Liability at 7 ¶ 19 (Dec. 25, 2000 Aff. of Jack D. Burstein, former Chairman of Transohio Savings, Chairman, President and CEO of TFC, and President and CEO of AMCAP).

On August 29, 1986, an Assistance Agreement was signed by Transohio Savings, AMCAP, TFC, and FSLIC, as a corporate instrumentality and agency of the United States. *See* Pl.App. on Liability at 228–92. The Assistance Agreement had several key provisions: 1. Transohio Savings would merge with Citizens and Dollar to form one entity to be known thereafter as Transohio Savings; 2. FSLIC would make a $107.5 million cash contribution to the "new" Transohio Savings; 3. FSLIC agreed to indemnify AMCAP, TFC, and Transohio Savings for certain claims and potential losses; 4. FSLIC agreed to purchase 19 "problem loans," representing approximately $41.5 million of Citizens' assets at their book value; 5. Transohio Savings would be allowed to book the $107.5 million in FSLIC assistance as a capital credit towards its regulatory net worth; 6. Transohio Savings would be allowed to amortize

intangible assets, *i.e.,* approximately $50 million in supervisory goodwill over a 25 year period using the straight line method of depreciation; and 7. AMCAP and TFC agreed to maintain the net worth of Transohio Savings at required regulatory levels and to a "Dividend Limitation Restriction." *Id.:* Pl. App. on Liability at 6 ¶ 17 (Burstein Aff.).

In addition, after the closing, the FHLBB issued a forbearance letter on September 10, 1986 promising that neither the FHLBB nor the FSLIC would foreclose on Transohio Savings in the event it failed to meet regulatory net worth requirements for a five-year period after Transohio Savings merged with Citizens/Dollar. *See* Pl.App. on Liability at 293–94. The consideration for this valuable promise made after the Citizens/Dollar acquisition closed is a matter to which the court will return.

On December 31, 1986, four months after the Citizens/Dollar merger was concluded, "[TFC] issued 626,219 shares of common stock pursuant to a shareholder rights offering. In addition, [TFC] issued 3,673,469 shares of common stock to [AMCAP] in a private placement transaction for an aggregate purchase price of approximately $45 million, [derived from AMCAP's June 1985 issuance of $80 million in subordinated notes, and subject to a prior FHLBB "approval order"]. As a result of these two transactions, [TFC] received net proceeds of $52 million, of which approximately $42 million was contributed to Transohio Savings as additional equity capital." Pl.App. on Damages at 570–72 (Dec. 31, 1986 SEC Form 10–K for AMCAP at 23–25); Pl. P.H.App. at 857–58. With the addition of this equity, Transohio Savings' regulatory capital "exceeded minimum regulatory requirements by approximately $158 million at December 31, 1986, taking into account an amount of approximately $106 million which [was to be] treated as regulatory capital pursuant to the terms of the financial assistance package entered into with the FSLIC in connection with the acquisitions of Citizens and Dollar. On December 31, 1986, [Transohio Savings'] net

worth, calculated on the basis of generally accepted accounting principles exceeded 3% of the liabilities by $31 million." *Id.* at 571.[3]

On September 30, 1989, Transohio Savings was in good financial shape with $284.4 million of regulatory capital on its books, of which $94.2 million was derived from the $107.5 million capital contribution made by FSLIC on August 29, 1986, and the inclusion of that amount as a capital contribution towards Transohio Savings regulatory requirement. *See* Pl.App. on Liability at 8. (The $13.3 million difference represents the amount of the capital contribution that Transohio Savings amortized since August 21, 1986. *Id.*) On December 7, 1989, the Financial Institutions Reform Law, Recovery, and Enforcement Act ("FIRREA") became effective and thereafter Office of Thrift Supervision ("OTS") no longer allowed Transohio Savings to amortize its remaining unamortized capital credit of approximately $94.2 million to meet core and risk-based regulatory requirements. *Id.* In addition, Transohio Savings could no longer utilize any of the remaining $50 million in goodwill to meet FIRREA's regulatory requirements. *Id.* Therefore, on December 7, 1989, Transohio Savings was in a position where its regulatory capital was reduced overnight by almost 50%, leaving it with only $144.2 million in regulatory capital.

On January 18, 1991, the OTS notified Transohio Savings of its intent to impose an Individual Minimum Capital Requirement ("IMCR"). *See Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 1991 WL 201178, *4 (D.D.C.1991) ("Transohio"). On May 23, 1991, OTS issued a final notice requiring Transohio Savings to increase its tangible capital by the greater of $100 million or an amount that would increase its tangible capital level to 4.5 percent of its tangible assets, however, Transohio Savings was unable to meet the IMCR. *See* Pl.App. on Liability at 8. On July 10, 1992, OTS issued an order and seized Transohio Savings and its assets. *See Transohio,* at *4.

**3.** As of December 31, 1986, the FHLBB required "a 5% liquidity ratio.... *[Transohio Savings']* liquidity ratio was 13.6% ... [which] primarily *reflects* the recent high levels of loan repayments, cash received in connection with the acquisitions of Citizens and Dollar *and the investment of additional available cash in liquid investments."* Pl. App. on Damages at 572 (emphasis added).

## PROCEDURAL BACKGROUND IN THE UNITED STATES COURT OF FEDERAL CLAIMS

On August 8, 1995, plaintiffs filed an action in this court asserting both breach of contract and takings claims. On March 25, 1997, the FDIC filed a complaint in intervention as the successor to the rights of Transohio Savings, pursuant to its management responsibilities over the Federal Resolution Fund–RTC ("FRF–RTC"). *See* FDIC Compl. The FDIC's complaint contained claims for: just compensation under the Fifth Amendment to the United States Constitution; Due Process under the Fifth Amendment; breach of contract; and frustration of purpose. *Id.* at ¶¶ 29–37.

On October 10, 2000, plaintiffs filed a motion for partial summary judgment regarding the Government's alleged breach of two specific promises: "(1) to record [the approximately $50 million in supervisory] goodwill created by the transaction as an intangible, amortizing asset, and to count the goodwill toward compliance with Transohio regulatory capital requirements; and (2) to record, as a direct credit to Transohio's regulatory capital, a $107.5 million cash contribution made by [FSLIC] in order to partially offset the massive net worth deficit of the failing thrifts that Plaintiffs acquired." Oct. 10, 2000 Plaintiff's Motion for Summary Judgment on Liability at 2.

On August 31, 2001, plaintiffs filed a motion for partial summary judgment regarding "the value of their investment in Transohio [Savings] at the time of the Citizens/Dollar deal under either a reliance or restitution theory." Pl. Mot. P.S.J. on Damages at 20; *see also id.* at 20–26. In addition, plaintiffs' motion seeks summary judgment as to a $42 million capital "infusion" made on December 31, 1986, shortly after the closing of the Citizens/Dollar acquisition, as "reliance damages." *Id.* at 27; *see also id.* at 27–31. On

August 31, 2001, plaintiffs filed an appendix of exhibits in support of their motion. *See* Pl.App. on Damages at 466–696. On that date, plaintiffs also filed Proposed Findings of Uncontroverted Facts, which incorporated by reference plaintiffs' Proposed Findings of Uncontroverted Facts, submitted with plaintiffs' October 10, 2000 motion for partial summary judgment as to liability.

On November 30, 2001, the Government filed a response. *See* Def. Resp. On November 30, 2001, the Government also submitted two volumes of appendices. *See* Def.App. on Damages 1–498. In addition, on that date, the Government filed a Statement of Genuine Issues, incorporating by reference the Government's December 18, 2000 Statement of Genuine Issues, submitted with its opposition to plaintiffs' motion for partial summary judgment concerning liability. On February 15, 2002, plaintiffs filed a "Combined Reply" in support of their motion for partial summary judgment with respect to damages.

On August 15, 2003, this case was assigned from the Honorable Loren Smith to the undersigned judge. On October 31, 2003, the court issued a memorandum opinion and order entering a judgment granting plaintiffs' October 10, 2000 motion as to liability. *See American Capital I,* 58 Fed.Cl. at 406–09. On November 17, 2003, the Government filed a motion for reconsideration. On December 19, 2003, plaintiffs filed a response, together with three additional exhibits. On January 23, 2004, defendant filed a reply.

On December 16, 2003, the court held oral argument on the plaintiffs' August 31, 2001 motion for partial summary judgment as to damages, in which the Government and FDIC participated. On January 13, 2004, the court issued an order allowing the parties and the FDIC the opportunity to address several issues that the parties requested to brief further and/or arose during the oral argument.[4] On February 13, 2004, the par-

---

4. The issues on which the court invited further briefing included:

(a) Whether shareholder plaintiffs may directly recover any or all of the Thrift's net equity value that the Thrift contributed, via merger, to the Dollar and Citizens transaction—particularly shareholder plaintiffs' contention that when they caused Transohio Savings Bank ("Transohio") to

merge with Citizens and Dollar, it was the economic legal equivalent of an out-of-pocket cash contribution by the shareholders, personally, equal to the amount of the Thrift's net equity.

(b) Whether, in light of recent Federal Circuit precedent concerning damages claims in *"Winstar*-related" cases, plaintiffs may pursue their claim for recovery of the positive equity value of

ties and the FDIC filed post-hearing memoranda.

On January 5, 2004, the Government filed a cross-motion for summary judgment upon plaintiffs' claims for restitution, together with a Statement of Genuine Facts In Support Thereof. On February 2, 2004, Plaintiffs filed an opposition, together with two additional exhibit documents on that same date. On February 2, 2004, the FDIC also filed an opposition. On February 17, 2004, the Government filed a reply. The substantive bases for the cross-motion was presented by the Government at the December 16, 2003 oral argument. *See* Dec. 16, 2003 Transcript at 63–89.

This memorandum opinion first will address the merits of the plaintiffs' August 31, 2001 motion for partial summary judgment as to damages, including the Government's January 5, 2004 cross-motion regarding restitution. The court then will address issues concerning the FDIC's standing and the court's scheduling of a final evidentiary hearing on damages.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims is authorized under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has clarified that the Tucker Act does not create any substantive right for monetary damages. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Instead, a plaintiff, must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000). Plaintiffs have properly plead a basis for the court's jurisdiction in this case. *See* Pl. Amended Compl.

### B. Standard For Decision On Summary Judgment.

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See* RCFC 56(c); *see also Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that

Transohio under both restitution and reliance theories.

(c) The relevance of the fact that, in internal memoranda prepared by the Federal Home Loan Bank Board, the shareholders' net equity in Transohio was listed as $128.8 million at the time of the Citizens/Dollar transaction.

(d) References in the record to the fact that the regulatory agencies knew, at the time of the Citizens/Dollar transaction, about plaintiffs' plan to infuse $40 to $45 million into Transohio.

(e) How plaintiffs decided upon the amount of their 1986 capital infusion into Transohio.

(f) Whether a shareholder of a corporation may assert reliance damage claims based upon its alleged contribution of the equity value of the corporation to a transaction, given that a shareholder does not possess an ownership interest in the property of a corporation but only an ownership interest in the corporation's stock, which plaintiff here did not contribute to the transaction.

(g) Whether the traditional causation standard in breach of contract cases in this Circuit requires the plaintiff to prove that the claimed damage resulted "inevitably and naturally, not possibly nor even probably" from the breach. *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 357 (1951) (citing *Myerle v. United States,* 33 Ct.Cl. 1, 1800 WL 2024 (1897)).

(h) Whether plaintiff can shift the burden of proof on the issue of causation in an breach of contract action to the defendant by pursuing a reliance damage claim.

(i) Whether a genuine issue of material fact has been raised that precludes summary judgment upon plaintiffs' reliance damage claim. *American Capital Corp. v. United States,* No. 95–523 (Fed.Cl. Jan. 13, 2004) (order regarding post hearing briefs).

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding the movant must meet its burden "by 'showing'—that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). The moving party may need only to support its motion with "solely . . . the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324, 106 S.Ct. 2548. If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the non-moving party to show a genuine factual dispute exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *Id.* at 1562–63.

The court is required to resolve any doubts about factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1987). In addition, all presumptions and reasonable inferences must be resolved in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995); *Jay v. Secretary of Dept.*

*of Health and Human Servs.,* 998 F.2d 979 (Fed.Cir.1993).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *Id.* (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). The court must evaluate each party's motion on its own merits. *Id.*

### C. Judicial Remedies For Breach Of Contract.

The Restatement recognizes three "[j]udicial remedies . . . to protect one or more of the following interests of a promisee" where a breach of contract has occurred: (a) the "expectation interest," *i.e.,* the "interest in having the benefit of [the] bargain by being put in as good a position as [the party] would have been in had the contract been performed;" (b) the "reliance interest," *i.e.,* the "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as [the party] would have been in had the contract not been made;" or (c) the "restitution interest," *i.e.,* the "interest in having restored to [the nonbreaching party] any benefit that the [non-breaching party] has conferred on the other party." *Id.* at § 344.

Traditionally, the courts have considered damages, whether awarded pursuant to an expectation theory or a reliance theory, to be a distinct remedy from restitution. *See, e.g., Rumsey Mfg. Corp. v. United States Hoffman Mach. Corp.,* 187 F.2d 927, 931–32 (2d Cir.1951) (L. Hand, J.). When a party seeks to recover based on the contract, damages are the appropriate remedy, not restitution, *i.e.,* a remedy for unjust enrichment nor . . . rescission of the contract. *See* Charles McCormick, Damages § 142 (1935) ("McCormick"). Therefore, this court is satisfied that damages in the context of *Winstar* cases better "conform to the more general aim of awarding compensation in all cases, and de-

parts from the standard of value of performance only because of the difficulty in applying the [latter standard]." *Id.* at 583–84.

### 1. Damages As A Remedy.

#### a. The "Expectation Interest."

Damages based on the expectation interest generally equate with lost profits, but can include other damage components. *See* RESTATEMENT at § 347. Therefore, "when a court concludes there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract. It does this by attempting to put [the injured party] in as good a position as [the injured party] would have been in had the contract been performed, that is, had there been no breach. The interest protected in this way is called the 'expectation interest.'" *Id.* at § 344 cmt. a. In this case, plaintiffs have foregone any claim they may have based on their "expectation interest." *See* Pl. Mot. P.S.J. at 18–31.

#### b. The "Reliance Interest."

It is well established that "the reliance claim must be considered as an option when the plaintiff cannot prove expectancy damages with reasonable certainty." DOBBS LAW OF REMEDIES ("DOBBS") § 12.3(1) (2d ed.1993); *see also* RESTATEMENT §§ 347, 349. Damages for a breach of contract based on reliance interest protects "an injured party that has relied and is of particular importance if the *cost of reliance* is an appreciable part of the expectation interest." FARNSWORTH, *supra* § 12.16. In this situation, as generally in contract law, the reliance interest is regarded as affording a means for giving *some relief* when the full expectation interest is for some reason inappropriate. *Id.* (emphasis added).

Therefore, where the injured party "may have changed its position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts[,] . . . the court may recognize a claim based on [its] reliance rather than on [its] expectation. It does this by attempting to put [the injured party] back in the position in which [it] would have been had the contract not been made." RESTATEMENT § 344 and cmt. a; DOBBS, *supra* § 12.31(a) ("The reliance recovery is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise.").

The RESTATEMENT recognizes at least two types of "reliance interest:" "essential reliance" and "incidental reliance" or "collateral reliance." *Id.* at § 349 cmt. a. Individually or collectively, these components ordinarily do not equal the plaintiff's "expectation interest," because a recovery based on the "reliance interest" excludes the injured party's lost profit. *Id.* at § 344 cmt. a. In other words, damages based on the "reliance interest" will never exceed an amount that would place the plaintiff in a better position, if awarded, than would be the case if the contract had been performed. *See* FARNSWORTH, *supra* § 12.16.

The relevant comment to the RESTATEMENT clarifies that "[l]oss in value and cost or other loss avoided are key component of [reliance] damages. . . . [However,] recovery for expenditures . . . may not exceed the full contract price." *Id.* at § 349 cmt. a. Accordingly, as a matter of law, a "plaintiff's reliance damages necessarily are limited to expenses incurred after the promise is made." *See* DOBBS, *supra* § 12.3(1) at 56; *see also* FARNSWORTH, *supra* § 12.16 n.2 (explaining that reliance damages seek to measure the injured party's cost of reliance on the breached contract, an injured party cannot recover for costs incurred before that party made the contract).

The law recognizes two types of reliance interests for which damages may be awarded: "essential reliance" and "incidental reliance" or "collateral reliance."

#### 1.) "Essential Reliance" Damages.

The law requires, where a breach of contract has occurred, an award of expenses based on plaintiff's actual outlay of funds as special damages for "essential reliance" *i.e.,* those that are "necessary or essential for the plaintiff's performance of his promises under the contract. . . . Essential reliance expense would normally be within the contemplation

of the parties, so its recovery would not be forbidden under the *Hadley v. Baxendale* rule[5] limiting consequential damages." DOBBS, *supra* § 12.3(2); *see also* RESTATEMENT § 349 cmt. a. "Essential reliance" damages also have been defined as, "the 'price' that a party must pay for what it is to receive under the contract." FARNSWORTH, *supra* § 12.1 at 153; *see also* Fuller and Perude, *supra* at 81 (" '[E]ssential reliance' consists of those acts which must occur before the plaintiff is entitled to the benefits of the contract and is therefore in a sense the 'price' of those benefits[.]' "). Damages to compensate for "essential reliance" include: "the performance of express and implied conditions in bilateral contracts, the performance of the act requested by an offer for a unilateral contract, preparations to perform in both of the cases … mentioned[.]" Fuller and Perdue, *supra* at 78.

### 2.) "Incidental Reliance" Or "Collateral Reliance" Damages.

In addition, the RESTATEMENT recognizes that damages may be awarded where expenses are foreseeable, *see* RESTATEMENT § 344(b), *and* are incurred in *"preparation for collateral transactions that a party plans to carry out when the contract … is performed*[.]" RESTATEMENT at § 349 cmt. a (emphasis added); *see also* FARNSWORTH, *supra* § 12.1 at 153. Professor Corbin refers to these expenditures in a functional manner, describing them as "collateral" to the contract:

> There are many expenditures made in reliance upon an existing contract that can not properly be regarded as having been made in part performance of it, or even as in necessary preparation for such performance. Such expenditures as these are not expected to be compensated directly by the

payments or other performance promised by the defendant, for they do not constitute a part of the agreed exchange. Nevertheless, the *net loss involved in such expenditures may be included in the damages awarded, if at the time the contract was made the defendant had reason to foresee that such expenditures would be made and that [its] own breach would prevent their reimbursement. These expenditures now referred to as collateral to the performance of a contract* for breach of which the action for damages is brought; and the net losses resulting may readily be regarded as too remote from contemplation and too likely to be the result of other factors to justify their inclusion in the damages for breach. Whenever their inclusion is just, their amount is *an addition to the full contract price unpaid, that is, to the full value of the performance promised and not rendered by the defendant.* They are included in damages, not because they would have been directly reimbursed by the performance promised by the defendant (or by its 'value' as ordinarily measured), but because the defendant's breach has prevented probable future gains and has rendered determination of their amount impossible.

ARTHUR L. CORBIN, 5 CORBIN ON CONTRACTS ("CORBIN") (1964 & Supp.1996) § 1035 (footnotes omitted) (emphasis added); *see also* Fuller and Perdue, *supra* at 78–84 (contrasting essential reliance damages with incidental or collateral damages).

■ Here, a bit of history is helpful. The first RESTATEMENT limited recovery for the reliance interest to "expenditure[s] reasonably made in performance of the contract or in necessary preparation therefor." RESTATEMENT OF CONTRACTS § 333 (1932). Following critical and persuasive scholarship,

---

5. The "fountainhead of the limitation of foreseeability is the famous English case of *Hadley v. Baxendale,* which in 1854 laid down general principles that are still honored today. A grist mill was idle because the crankshaft of the steam engine that drove it was broken. The miller gave a carrier the broken shaft to take to its manufacturer so that a duplicate could be made to replace it. When the carriage was delayed, the reopening of the mill was delayed for several days, and the miller sued the carrier for loss of

profits." FARNSWORTH, *supra* § 12.14. The significant rule of this case is that "consequential damages" should be denied by the court unless the loss "may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract as the probable result of the breach of it." *Id.* (quoting *Hadley v. Baxendale,* 156 Eng. Rep. 145, 151 (Ex. 1854)); *see also* L.L. Fuller and William R. Perdue, Jr., *The Reliance Interest in Contract Damages:* 1, 46 YALE L. J., 52, 84–96 (1936) ("Fuller and Perdue").

largely of Fuller and Perdue, today the RE-STATEMENT § 349 endorses a black letter rule that allows damages to be awarded based on the promisee's reliance interest, *i.e.*, expenditures made in preparation for performance or in performance, including, but not limited to, recovery of expenditures invested in collateral transactions. *See* Robert A. Hudec, *Symposium: The Restatement (Second) of Contracts: Restating the 'Reliance Interest.'* 67 CORNELL L. REV. 704, 723–28 (April 1982).

### c. Calculating Damages Based On The Reliance Interest.

The purpose of damages based on the reliance interest is "to reimburse the injured party so that he is put in as good a position as he would have been in had the contract not been made[.]" RESTATEMENT at § 344. Accordingly, after calculating expenses incurred by the plaintiff based on its total reliance interest, *i.e.*, "essential reliance" plus "incidental reliance" or "collateral reliance," the court should first deduct any benefits "plaintiff receives from the expenditures in reliance." DOBBS, *supra* § 12.3(1) at 51–52; *see also* Fuller and Perdue, *supra* at 81 ("If a plaintiff should perform his side of the contract and then claim both compensation for the reliance involved in his performance and at the same time the full value of defendant's performance, it would be obvious that he was asking too much.").

The RESTATEMENT also provides that deductions should be taken for "any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." RESTATEMENT § 349.

As the relevant RESTATEMENT comment explains, however, the burden of establishing any losses defendant claimed would have been incurred by plaintiff, even if the contract had not been breached, falls squarely on the defendant. RESTATEMENT § 349 cmt. a ("[I]t is open to the party in breach to prove the amount of the loss, to the extent

that [it] can do so with reasonably certainty . . . and have it subtracted from the injured party's damages."); *see also* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW ("POSNER") § 4.8 (5th ed.1998) (since the "reliance measure [is] on the victim's loss from the breach," reliance damages may never exceed the plaintiff's "net reliance loss.");[6] DOBBS, *supra* § 12.3(1). For this reason, the "reliance measure of damages . . . will tend, therefore, to understate the social costs of breach." POSNER, *supra* § 4.8.

### d. Additional Doctrinal Limitations On Damages.

The doctrines of foreseeability, avoidability,[7] and uncertainty are well embedded common-law limitations on any damage award for breach of contract, based on a reliance interest.

### 1.) Foreseeability.

Professor Corbin cautions: "Our only test of 'causation,' . . . is foreseeability, based upon uniformity of sequence in our experience. Without question we frequently make mistakes in determining causes . . . damages are recoverable only for those injuries that the defendant had reason to foresee as a probable result of [its] breach when the contract was made." 11 CORBIN § 1007 at 60–61 (interim ed.2002). Pragmatically, Professor Corbin asks: "at what time must the defendant have had *some reason* to foresee the injury? The answer generally made is that [defendant] must have had such reason at the time that he enters into the contract, and that it is not enough that he had such reason at the time that [defendant] committed the breach." *Id.* § 1008 at 64.

The RESTATEMENT likewise provides that damages are "not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." *Id.* at § 351(1). A foreseeable loss is defined as "a

---

6. The author is currently the Chief Judge of the United States Court of Appeals for the Seventh Circuit.

7. The doctrine of avoidability also is an important limitation on damages, but one that is not

applicable in the *Winstar* context since none of the injured parties could have avoided the loss that resulted from the enactment and implementation of FIRREA. *See generally* RESTATEMENT at § 350.

probable result of a breach because it follows from the breach (a) in the ordinary cause of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Id.* at § 351(2). The court is advised that it may limit damages where a loss is determined to be foreseeable "by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." *Id.* at § 351(3). FARNSWORTH notes that the RESTATEMENT § 351(3) allows a court to limit damages for "foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or if ... the circumstances [of] justice so requires to avoid disproportionate compensation." FARNSWORTH, *supra* § 12.17.

Moreover, Comment a to RESTATEMENT § 351 states that the breaching party is generally "expected to take account of those risks that are foreseeable at the time [it] makes the contract. [The party at breach is not] liable in the event of breach for loss that [it] did not at the time of the contracting have reason to foresee as a probable result of such a breach." *Id.* at § 351 cmt. a.

Accordingly, foreseeability inquiry is central to whether damages are appropriate in all *Winstar* cases, as well as the theory under which recovery may be appropriate. The issue is whether the party in breach had reason to foresee the "loss," not the precipitating events that caused the loss. Again, as Professor Corbin explains:

> The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefore in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.

11 CORBIN, *supra* § 1009 at 66.

Therefore, the Government is not required to know, or even suspect, that a loss would be caused by the enactment of FIRREA, only that the Government foresaw, at the time the Assistance Agreement was made, the amounts that were being placed at risk and could be lost, regardless of the actual cause of the loss. "It is enough ...that the loss was foreseeable as a probable ... result of [a] breach." RESTATEMENT at § 351 cmt. a; *see also Prudential Ins. Co. v. United States,* 801 F.2d 1295, 1300 (Fed.Cir.1986) (citing *Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903) for the proposition that "the party who breaches a contract can only be held responsible for such consequences as may be reasonably supposed to be within the contemplation of the parties at the time the contract was made."). The RESTATEMENT, however, instructs: "There is no requirement of foreseeability with respect to the injured party.... [However,] the requirement of foreseeability is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause in the case of an action in tort or for breach of warranty." *Id.* at § 351 cmt. a.

### 2.) Uncertainty.

Uncertainty is a separate and independent limitation on damages from avoidability or foreseeability. Here, the RESTATEMENT advises that damages for breach of contract are "not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." *Id.* at § 352. As the RESTATEMENT explains, the doctrine of uncertainty "excludes those elements of loss that cannot be proved with reasonable certainty." *Id.* at § 352 cmt. a.

### 2. Restitution As A Remedy.

■ Restitution is an alternative remedy to damages that is equitable in nature and seeks to protect the injury party's restitution interest by requiring the party in breach to disgorge any benefit received to prevent unjust enrichment, rather than to enforce the contract. *See* FARNSWORTH, *supra* § 12.1 at 154. Therefore, "[b]ecause the doctrine of restitution looks to the reasonable value of any benefit conferred upon the defendant by the plaintiff, and is not governed by the

terms of the parties' agreement, restitution is available even if the plaintiff would have lost money on the contract if it had been fully performed." *See Bausch & Lomb, Inc. v. Bressler,* 977 F.2d 720, 730 (2d Cir.1992).[8]

Where an injured party not only has changed its position in reliance on the contract but also has conferred a benefit on the other party by, for example, making a partial payment or providing services under the contract, the court may require the other party to "disgorge" the benefit that it received by returning it to the party who conferred it. The interest of the claimant protected in this way is the "restitution interest." *See* RESTATEMENT at § 344 cmt. a. Restitution, however, is only available as a remedy for a total breach of contract; if the claim is for damages for a partial breach, restitution may not be awarded. *See* FARNSWORTH, *supra* § 12.19 at 325.

The RESTATEMENT defines restitution as a party's "interest in having restored to him any benefit that he has conferred on the other party." *Id.* at § 344(c). The comment following this definition explains that the purpose of a restitutionary remedy is to prevent "unjust enrichment." *Id.* at § 344 cmt. a. Therefore, before an award of restitution can be made, the injured party must return or account for any benefit that it has received under the contract. FARNSWORTH, *supra* § 12.19. Although restitution may be equal to the amount of expectation or reliance interests, "it is ordinarily smaller because it includes neither the injured party's lost profit nor that part of his expenditures in reliance that resulted in no benefit to the other party." RESTATEMENT at § 344 cmt. a; *see also* FARNSWORTH, *supra* § 12.19. Recovery in restitution, however, may exceed the contract price. *Id.* at § 12.20.

The object of restitution is not to return the parties to the *status quo ante* (this being the object of the "reliance interest"); rather it is to deprive the defendant of an unjust gain realized at the expense of the plaintiff. *See* FARNSWORTH, *supra* § 12.19. Thus, restitution is available only when the plaintiff has changed its position in reliance on the

contract and also has conferred a benefit on the defendant. *See* DOBBS, *supra* § 12.3(1). Accordingly, restitution allows the plaintiff not only to return to its position prior to the contract, but also to receive any benefit that the plaintiff conferred on the defendant.

The RESTATEMENT further advises the court that restitution is available only when an injured party "instead of seeking to enforce an agreement, claims relief on the ground that the other party has been unjustly enriched as a result of some benefit conferred under the agreement." *Id.* at § 344 cmt. d. None of the examples cited by the RESTATEMENT where restitution typically arises is applicable here. *Id.* (where the "agreement is not enforceable, perhaps because of [the injured party's] own breach (§ 374), as a result of impracticality of performance or frustration of purpose (§ 377(1)), under the Statute of Frauds (§ 375), or in consequence of the other party's avoidance for some reason as misrepresentation, duress, mistake or incapacity (§ 376)").

The RESTATEMENT also provides when the other party is in breach, "the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance." RESTATEMENT at § 373(1). Restitution is available where the breach is by non-performance or repudiation by the breaching party. *Id.* at § 373 cmt. a. Restitution, however, should be "denied if the injured party has fully performed, and all that remains is for the party in breach to pay a definite sum in money as the price of that performance." FARNSWORTH, *supra* § 12.20 at 335. In addition, where restitution in kind is not possible, "a sum of money will generally be allowed based on the restitution interest." RESTATEMENT at § 344 cmt. d; *see also id.* at § 345 cmt. c ("If restoration of the specific thing is not appropriate, the restitution interest may be protected by requiring the other party to pay a sum of money equivalent to the benefit that he has derived from that thing.").

---

**8.** The author of this decision, the Honorable John M. Walker, Jr., is currently the Chief Judge of the United States Court of Appeals for the Second Circuit.

### 3. Consideration Of Reliance And Restitution Interests By The United States Court Of Appeals For The Federal Circuit In *Winstar* Cases.

To date, the United States Court of Appeals for the Federal Circuit has considered reliance and restitution interests in the context of four *Winstar* cases. *See LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed.Cir.2003);[9] *Castle v. United States*, 301 F.3d 1328 (Fed.Cir.2002); *Landmark Land Co., Inc. v. Federal Deposit Ins. Corp.*, 256 F.3d 1365 (Fed.Cir.2001); and *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir.2001). The court will review each in brief.

After determining liability, the United States Court of Federal Claims awarded Glendale Federal Bank ("Glendale") restitution and "non-overlapping reliance damages." *Glendale*, 239 F.3d at 1378. The Federal Circuit, however, reversed that award and held that the proper substantive theory under which damages should be awarded was not restitution, in the amount of the failed thrift's net liabilities on the date of the merger, but rather damages reflecting Glendale's reliance interest because, "[t]he idea behind restitution is to restore-that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Id.* at 1380; *see also* RESTATEMENT at § 384 cmt. a ("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return to what he has received from the other party. The objective is to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract.").[10]

The Federal Circuit observed that "it is clear that the Government's promise that was breached had substantial value." *Glendale*, 239 F.3d at 1381–82. On one hand, "there can be no doubt that, for a banker interested in purchasing a failing thrift, the promise [whether a special bookkeeping procedure or promise to waive regulatory requirements on capital reserve for a specified number of years] was of substantial value[.]" *Id.* at 1382. Our appellate court put its finger on the pulse of the *Winstar* cases when it recognized, "[i]n a very real sense, what the Government received in exchange for its promise was time-time to deal with other failing S & L's, time·to see what the market would do before having to commit substantial resources to the problem. Though the value of time was worth more than zero, there is no proof of what in fact it was worth." *Id.* Thus, the Federal Circuit concluded, "We do not see how the restitution award granted by the trial court, measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld[.]" *Id.* Instead, the Federal Circuit concluded that the appropriate remedy in *Winstar* cases should be damages reflecting the reliance interest. *Id.* at 1383 ("Reliance damages will permit a more finely tuned calculation of the actual losses sustained by plaintiff as a result of the Government's breach.").[11]

In *Landmark*, a different panel of the Federal Circuit affirmed an award for damages made under a theory of restitution "for the entire amount of [plaintiff's] net loss that was either required or foreseeable under the contract[.]" *Landmark*, 256 F.3d at 1369.[12] In that case, the Federal Circuit stated that there are two alternative measures of restitu-

---

9. *LaSalle Talman* also concerned claims based on a plaintiff's expectancy interest. In addition, in *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345–46 (Fed.Cir.2003) and *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001), the Federal Circuit reviewed decisions of the United States Court of Federal Claims where a plaintiff elected to pursue damages solely for its expectancy interest.

10. The Federal Circuit, however, did not consider that a party seeking restitution in the *Winstar* context may not need to return any interest in property received, since the property may be "worthless when received[.]" RESTATEMENT at § 384(2)(a).

11. The author of *Glendale* was Senior Circuit Judge Plager. Chief Judge Mayer and Circuit Judge Linn were the other members of the panel.

12. The author of *Landmark* was Circuit Judge Michel. Senior Circuit Judge Archer and Circuit Judge Schall were the other members of the panel.

tion: "The first is the value of the benefits received by the defendant due to the plaintiff's performance. The second is the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract." *Id.* at 1372.

In *Landmark*, the Assistance Agreement required the plaintiff to make an initial contribution of $20 million, but did not limit the total amount of the contribution. *See Landmark*, 256 F.3d at 1372. Accordingly, the Federal Circuit affirmed the trial court's awarding plaintiff $21.5 million, since that was the amount that the plaintiffs actually contributed in cash and real estate. *Id.* at 1373. In addition, the Assistance Agreement required Landmark to make an additional cash or real estate contribution in an amount not less than 3 percent of total liability within five years of the acquisition date. *Id.* at 1374. In 1983, a year after the acquisition, Landmark conveyed the balance of its assets to the failing thrift that it acquired, but the record showed did so primarily to obtain advantageous tax treatment of the profits that were expected to be made upon the later sale of these assets, rather than related to "any duty of performance under the Assistance Agreement." *Id.* at 1375. Because that contribution was not required under the contract, the Federal Circuit affirmed the trial court's denial of plaintiff's contribution under a theory of restitution. *Id.* at 1377.

In the alternative, Landmark sought damages in the amount of its 1983 contribution under a theory of reliance, where the "loss must have been foreseeable to the party in breach at the time of contract formation." *Id.* at 1378 (citing RESTATEMENT at § 351(1)) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."). Once again, the Federal Circuit concurred with the trial court's finding that "The government was aware that Landmark was in the property development business, but it had no reason

to foresee ... at the time of contracting that a breach of the Assistance Agreement would cause Landmark to lose its entire business." *Id.* at 1378–79 (quoting *Landmark Land Corp. v. United States*, 46 Fed.Cl. 261, 270 (2000)). Therefore, this panel of the Federal Circuit concluded that the loss of Landmark's 1983 contribution to the failing thrift, consisting of almost all its assets, was not foreseeable. *Id.*

In *Castle*, a third panel of the Federal Circuit considered an appeal where the plaintiffs were among a group of investors who contributed $15.12 million to a failed savings and loan association, in exchange for the government's promise to afford the institution "particular regulatory treatment." *Castle*, 301 F.3d at 1339.[13] The individual investors signed a Regulatory Capital Maintenance Agreement, but did so as representatives of the failed institution and therefore assumed no individual financial liability. *Id.* at 1340. The Federal Circuit reasoned, in denying restitution, "Our precedent makes clear that [plaintiffs] cannot recover restitutionary damages in any amount contributed voluntarily, beyond their contractual obligations." *Id.* (citing *Landmark*, 256 F.3d at 1372–77). The Federal Circuit also rejected plaintiffs' alternative argument for $15.12 million under a reliance theory of damages, asserted on behalf of all shareholders, since none were signatories on the contract. *Id.* at 1340–41. In addition, the Federal Circuit denied the two principal shareholders a reliance recovery of about $1 million because $10 million in capital was needed to keep the savings and loan institution from falling out of regulatory compliance and breaching a "Regulatory Capital Maintenance Agreement" prior to the enactment of FIRREA. *Id.* ("The absence of a causal link between the alleged breach and the loss [shareholders] purport to have contributed in reliance precludes recovery of their individual contributions ... under a reliance theory of damages.").

In *LaSalle Talman*, 317 F.3d 1363 (Fed. Cir.2003), a fourth panel of the Federal Cir-

---

**13.** The author of *Castle* was Circuit Judge Gajarsa. Circuit Judge Lourie and Circuit Judge Rad-
er were the other members of the panel.

cuit remanded a case to the United States Court of Federal Claims to reconsider the effect of the payment of a return on capital in its reconsideration of its expectancy damage award and affirmed the holding of *Glendale* that "assumed 'goodwill' liabilities as a cost of performance" ... are "not a useable measure" of damages for the government's breach. *Id.* at 1376–77.[14]

### 4. Resolution Of Plaintiffs' Motion For Partial Summary Judgment As To Damages.

#### a. Issues Raised By The Parties.

Plaintiffs seek recovery of damages under both reliance and restitution theories. First, plaintiffs seek the "recovery of the value of their ownership interest in Transohio [Savings] at the time of the Citizens/Dollar transaction." Pl. Mot. P.S.J. at 18. Plaintiffs also assert that the merger of Transohio Savings into Citizens and Dollar was the "economic legal equivalent of an out-of-pocket cash contribution ... equal to the amount of the Thrift's net equity." Pl. P.H. Brief at 2. In addition, plaintiffs seek recovery of the $42.166 million capital transferred to Transohio Savings by TFC as a result of AMCAP's purchase of TFC securities pursuant to the Transohio Rights Offering on December 31, 1986. *See* Pl. Mot. P.S.J. at 27–31. Plaintiffs claim this transfer of capital in the amount of $42.166 million was made in direct reliance on the Government's contractual promises and was "both actually foreseen by and reasonably foreseeable to the Government at time of the Citizens/Dollar transaction." Pl. Mot. P.S.J. at 29.

The Government argues that the court may not grant summary judgment as to reliance damages either as to the value of Transohio Savings' equity at the time of the Citizens/Dollar acquisition or the $42.166 million that TFC "infused into Transohio for independent business expansion purposes not required by the acquisition transaction documents." Def. Resp. at 29. The Government

first asserts that neither of these amounts represents " 'expenditures' involved in preparing to perform or performing the contract." *Id., see also id.* at 29–31 (contending that the "value" of Transohio Savings was not a "cost" or "expenditure"). Next, the Government claims that plaintiffs have not shown that the breach caused their losses. *Id.* at 31. The Government argues that, even if plaintiffs had reliance damages, summary judgment is precluded because "factual discrepancies exist relating to the asserted valuation, valuation methodology and required offsets for an award of reliance damages[.]" *Id.* at 29; *see also id.* at 32–33.

#### b. Damages Are An Appropriate Remedy To Compensate Plaintiffs For The Government's Breach Of Contract In This Case.

##### 1.) TFC Is Entitled To Summary Judgment Regarding Its "Essential Reliance" Interest In The Amount Of $126.479 Million, The Equity Value Of Transohio Savings Stock, As Of August 29, 1986, Subject To A Final Evidentiary Hearing On Damages.

■ In this case, the "essential reliance" interest is the cost of performance for the Assistance Agreement, *i.e.,* what was "put on the table" by plaintiffs as consideration for FSLIC's agreement to convey to Transohio Savings: title to the assets and liabilities of Citizens and Dollar, which had a *negative* net worth of $130 million; a cash payment of $107.5 million, which also could be counted as a capital credit towards Transohio Savings' regulatory net worth; and permission to amortize approximately $50 million in supervisory goodwill, over a 25 year period using the straight line method of depreciation. *See* Def.App. on Damages II at 74.

Plaintiffs claim that they are entitled "under a reliance framework" either to $126,479,000, the value of Transohio's equity at the time the Assistance Agreement was finalized [15] or $216.1 million, an estimate of

---

14. The author of *LaSalle Talman* was Circuit Judge Newman. Senior Circuit Judge Freidman and Circuit Judge Lourie were the other members of the panel.

15. Transohio Savings' "Regulatory Statement of Financial Condition," reviewed by Transohio Savings' independent auditors, Peat, Marwick, Mitchell & Co., and submitted to the FHLBB on November 26, 1987, without subsequent objec-

the "market value" of Transohio's equity made by Professor Timothy Koch, an expert for the FDIC. *See* Pl. Mot. P.S.J. at 24 (citing Pl.App. on Damages at 680, 690–91). The Government correctly points out that the "Assistance Agreement, FHLBB Resolution and Forbearance Letter make *no mention of* any contribution on the part of the plaintiffs to the transaction." Def. Resp. at 20. Here, the Government relies on TFC and AM-CAP's SEC Forms 8–K, dated August 29, 1986, which state that "[n]o consideration" was paid by either company or Transohio Savings in connection with Transohio Savings' acquisition of Citizens/Dollar. *See* Def. App. on Damages at 96, 98.

The August 29, 1986 Assistance Agreement, signed by plaintiffs, Transohio Savings, and FSLIC, specifically conditioned the FSLIC's obligations on the satisfaction of conditions previously discussed. *See* Def. App. on Damages II at 13–16 (§ 2 Conditions of the Assistance Agreement). In addition, FSLIC required, and received, legal assurance that Transohio Savings, Dollar, and Citizens had entered into "separate Merger Agreements and Plans of Merger, pursuant to which TRANSOHIO [SAVINGS] will succeed to all of the rights and liabilities of DOLLAR and CITIZENS, and all of the assets and property of every kind and character belonging to DOLLAR and CITIZENS will be vested in and become the property of TRANSOHIO [SAVINGS], except for the covered assets purchased by the [FSLIC] as provided in this Agreement." Def.App. on Damages II at 8–9 (Recital C of the Assistance Agreement). The Assistance Agreement further provides, "In consideration of the mutual promises contained in this [Assistance] Agreement, the parties enter into the following agreement." Def.App. on Damages II at 9 (Recital F of the Assistance Agreement). Therefore, although it is true that neither plaintiffs nor Transohio Savings paid any cash consideration when Citizens/Dollar were merged into Transohio Savings, TFC, Transohio Savings' sole shareholder, "put on the table" an ongoing business with equity valued at $126.479 million, which was the

contract "price" paid as performance for the benefits set forth in the Assistance Agreement. *See* RESTATEMENT § 349.

The Government also argues that TFC's surrender of its equity in Transohio Savings was not an "expenditure" or "cost" in performance of the Assistance Agreement and implies that the only legitimate form of consideration must be either cash or real estate. *See* Def. Resp. at 29–31. Certainly, that is not the holding in *Landmark*. In that case, the plaintiff real estate development company signed a contract with FSLIC to acquire two failing thrifts and required plaintiff to make an initial contribution of not less than $20 million to one of the thrifts. "Landmark did this by contributing real estate and cash valued at $21.5 million. In exchange, the FSLIC agreed to allow [the newly capitalized thrift] to treat its shortfall in actual assets as supervisory goodwill, which could be applied to [its] *regulatory capital maintenance requirements." Landmark*, 256 F.3d at 1370. The Federal Circuit affirmed the trial court's award of approximately $21.5 million in restitution since that amount was required under the terms of the Assistance Agreement. *Id.* at 1373 ("[T]he entirety of Landmark's $21.5 million initial contribution constitutes performance under the Agreement[.]"). In this case, the FSLIC required that the owners of Transohio Savings agree to allow Transohio Savings, in which they held stock valued at $126.479 million, to acquire two failed thrift institutions with a negative net worth of $130 million, which would have wiped out plaintiffs' entire equity interest, but for the benefits promised by the Government that were intended to preserve plaintiffs' equity position in Transohio Savings. *See* Pl.App. on Damages at 233 (Aug. 29, 1986 Assistance Agreement Recital C); *id.* at 240 ("[FSLIC] shall receive certified copies of the corporate resolutions of AMCAP, TFC, and TRANSOHIO, as appropriate, authorizing the Mergers, the Merger Agreements and this Agreement, and the execution and delivery of the Merger Agreements, this Agreement, and any other agreements and stipulations which

---

tion, (*see* Pl.App. on Damages at 562) reports that the equity value of the stock of the Transohio Savings as of August 29, 1986 was $126,479,000.

*See* Pl.App. on Damages at 563 (Premerger Transohio Balances–Total Shareholder Equity).

AMCAP, TFC, and TRANSOHIO are required to execute pursuant to this Agreement and the resolutions of the BANK BOARD approving the Merger, the Merger Agreement and this Agreement."); *see also* Pl.App. on Damages at 570 (the fair value of liabilities assumed in the acquisition exceeded the fair value of assets acquired by approximately $56 million). *Id.* at 653, 664.

Although the RESTATEMENT does not define "expenditures," it clearly states that reliance damages are to be measured by the "loss" incurred by the non-breaching party, "including [but not limited to] expenditures made … *in performance.*" *See* RESTATEMENT § 349 at 124; RESTATEMENT § 349 cmt. a at 124 ("*Loss in value* and cost or other loss avoided are key components of contract damages."); *see also United States v. Behan,* 110 U.S. 338, 344–45, 4 S.Ct. 81, 28 L.Ed. 168 (1884) (holding that the non-breaching party may always recover the "*loss* of actual outlay and expense.") (emphasis added). Therefore, the actual outlay of TFC's equity in Transohio Savings was the "contract price" for the Government's cash contribution of $107.5 million to Transohio Savings, also which could be counted as a capital credit towards Transohio Savings' regulatory net worth (*see* Pl. App. on Liability at 212), and the Government allowing Transohio Savings to amortize $50 million in supervisory goodwill over a 25 year period using a straight line method of depreciation. *See* Pl.App. on Liability at 14–25 (Aug. 21, 1986 FHLBB Resolution No. 86–864); *id.* at 233–280 (Aug. 29, 1986 Assistance Agreement); Def.App. on Damages II at 74. Therefore, as a matter of law, the value of Transohio Savings' equity as of August 29, 1986 represents TFC's "essential reliance" interest. *See* Pl.App. on Damages at 562–63. And, the loss of this amount, as a result of the Government's breach, if restored to TFC, will "put [TFC] in as good a position [in which it] would have been in had the contract not been made[.]" RESTATEMENT § 344.

In making this determination, the court has considered and is satisfied that foresee-

ability requirements have been met since the record establishes the regulatory agencies knew TFC's equity in Transohio Savings was valued at $126,479,000 at the time the Assistance Agreement was finalized. *See* Pl.App. on Damages at 563; *see also* RESTATEMENT § 351(2). In addition, since the Government did not object to this amount, which also was verified by independent auditors, it likewise satisfies the "reasonable certainty" requirement. *Id.; see also* RESTATEMENT § 352.

The court also has examined the June 29, 2001 Report of Professor Koch, *see* Def.App. on Damages II at 491–542, and the report of the Government's damage experts, R. Larry Johnson, *id.* at 341–367, and Dr. Wallace G. Hamm. *Id.* at 368–490. In light of the significant dispute between the experts, the court denies plaintiffs' motion for summary judgment as to TFC's "essential reliance" interest based on Professor Koch's report. For the reasons discussed below, however, the court will allow plaintiffs to proffer Professor Koch and the Government to proffer its experts at a final evidentiary hearing on damages.

Accordingly, the court grants plaintiffs' motion for partial summary judgment regarding TFC's "essential reliance" interest, *i.e.,* the value of Transohio Savings' equity in the amount of $126,479,000, subject to a final evidentiary hearing on damages.[16]

**2.) TFC Is Entitled To Summary Judgment Regarding Its "Collateral Reliance" Interest In The Amount of $42.166 Million, The Capital TFC Transferred To Transohio Savings As A Result Of The December 31, 1986 Transohio Rights Offering, Subject To A Final Evidentiary Hearing On Damages.**

■ The court has analyzed plaintiffs' claim concerning the $42.166 million of capital that TFC contributed to Transohio Savings as a result of the December 31, 1986 Transohio Rights Offering in two ways. First, the RESTATEMENT recognizes that expenses incurred "in preparation for collateral

---

**16.** The court has not considered whether AMCAP is entitled to a portion of this amount based on its alleged ownership of First Global and that entity's 50.8% alleged ownership of 100% of TFC's stock.

transactions that a party plans to carry out when the contract is performed" may be recovered as "incidental reliance" or "collateral reliance" damages. *See* RESTATEMENT § 349 cmt. b. As the United States Court of Appeals for the Federal Circuit has confirmed, there can be more than one type of reliance damages because the "underlying principle ... is that a party who relies on another party's promise made binding through contract is entitled to damages for *any* losses actually sustained as a result of the breach of that promise." *Glendale*, 239 F.3d at 1382 (emphasis added); *see also* POSNER at § 4.8 at 133 (defining the "reliance loss—[as] the *sum* of the costs [the injured party] incurred as a result of the contract[.]") (emphasis added).

Although the August 29, 1986 Assistance Agreement did not require plaintiffs to provide Transohio Savings with any amount of capital after the acquisition of Citizens/Dollar, shortly thereafter plaintiffs executed plans previously discussed with the regulators to provide Transohio Savings with over $40 million plus of additional capital to support "*additional* growth and acquisitions of Transohio [Savings]." Pl. Mot. P.S.J. at 27 (emphasis in original). In fact, the record evidences that the FHLBB had actual knowledge of these plans some time prior to June 1985, at the time AMCAP issued an $80 million subordinated debt offering, which the FHLBB conditioned so that a substantial portion of the proceeds would be available to be provided as capital to Transohio Savings after it merged with Citizens and Dollar. *See* Pl.App. on Damages at 537; Pl.App. on Liability at 64; Pl. P.H.App. at 857–58; *see also* Pl. P.H.App. at 736.

The court also has considered and is satisfied that the record includes ample evidence that, on August 29, 1986, when the Assistance Agreement was finalized, the Government had actual notice and therefore reason to foresee that the additional $42.166 million in capital would be made available to Transohio Savings as a result of a Transohio Rights Offering. *Id.; see also* Pl.App. on Damages at 640, 648–49. Again, the fact and amount of this additional capitalization are a matter of public record in plaintiffs' Securities and Exchange Commission disclosures. Moreover, they are not contested by the Government and meet certainty requirements. In addition, but for plaintiffs' reliance on the full benefit of the Government's contractual promises, regarding the $107.5 million capital credit and amortization of the $50 million in supervisory goodwill, plaintiffs would not have gone forward with the $42.166 million Transohio Rights Offering. *See* Pl.App. on Liability at 9; Pl.App. on Damages at 641; Pl. P.H.App. at 738 (May 6, 1986 FSLIC Application H-(e)3 of AMCAP, TFC and Transohio Savings re: Acquisition of Citizens/Dollar advising "Applicants view Federal Home Loan Bank Board approval of the application and requests submitted in connection with the [Transohio] Rights Offering ... as integral to the acquisition of Citizens and Dollar.").

Plaintiffs have demonstrated that the $42.166 million was made in a collateral transaction to support the implementation of the August 29, 1986 Assistance Agreement, as well as to finance other potential acquisitions to leverage Transohio Savings' regulatory net worth. Therefore, TFC is entitled to summary judgment regarding its "collateral reliance" interest. As the United States Court of Appeals for the Seventh Circuit recently held in *Designer Direct, Inc. v. DeForest Redevelopment Authority*, 313 F.3d 1036, 1049, (7th Cir.2002), specifically relying on *Glendale*, ("The RESTATEMENT and case law are clear.... [R]eliance damages are not limited to those expenses made in relation to duties spelled out in the contractual agreement.").

In the alternative, the court has determined that the $42.166 million capital collateral in Transohio Savings resulting from the Transohio Rights Offering may be viewed as consideration and acceptance of the terms of the September 10, 1986 FHLBB Forbearance Letter. *See* Pl.App. on Liability at 293–94. On October 31, 2003, the court held that the August 29, 1986 Assistance Agreement was breached by the enactment and implementation of FIRREA with regard to the plaintiffs in this case. *See American Capital I*, 58 Fed.Cl. at 409. In doing so the court, like the United States Court of Appeals for

the District of Columbia in a related prior case, did not consider that the September 10, 1986 FHLBB Forbearance Letter was a part of the contract between the parties. *Compare American Capital I*, 58 Fed.Cl. at 408 *with Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 618 (D.C.Cir.1992). Therefore, even if the court has misconstrued the law regarding "collateral reliance," the court is well within existing precedent in granting summary judgment to Transohio Savings' sole shareholder for its "essential reliance" interest based on the separate agreement that arose as a result of the "post-contract" September 10, 1986 FHLBB Forbearance Letter and subsequent acceptance by TFC, by proceeding with the Transohio Rights Offering that resulted in an $42.166 million capital contribution to Transohio Savings. The factual circumstances here are unique. Transohio Savings was a party to the Forbearance Letter agreement, but it only had one shareholder, TFC, that also was a signatory on the August 29, 1986 Assistance Agreement that established regulatory net worth requirements. *See* Pl.App. on Liability at 265–66 (establishing "net worth maintenance" covenants binding TFC). Therefore, in the court's judgment, TFC was entitled to the benefits of the September 10, 1986 Forbearance Letter as a third-party beneficiary. *See FDIC v. United States*, 342 F.3d 1313, 1319 (Fed.Cir.2003) (citing RESTATEMENT § 315) (quoting *Glass v. United States*, 258 F.3d 1349, 1354 (Fed.Cir.2001) ("Third party beneficiary status is an 'exceptional privilege' and, to avail oneself of this exception privilege, a party must 'at least show that [the contract] was intended for the direct benefit.' ")).

The court does not view either of these awards as a "windfall," since lost profits or opportunity costs are not included. As the United States Court of Appeals for the First Circuit observed in *DPJ Co., Ltd. Partnership v. FDIC*, 30 F.3d 247 (1st Cir.1994): "There is normally no windfall invoked in the recovery of reliance damages . . . , [i.e., those]

seeking to recapture money actually spent under the [contract] . . . . Whether or not one shares Congress' belief that 'lost profits or opportunities' are a special category of damages which should be disfavored, that policy is not even remotely offended by returning [plaintiff] its out-of-pocket expenditures which, because of the FDIC's repudiation, have made [plaintiff's] own expenditures . . . fruitless." *Id.* at 249–50.[17] Thus, reliance damages *"merely restore to the claimant[s] what* [they] spent before the opportunity was withdrawn." (emphasis added). *See* POSNER at § 4.8, ("[T]he reliance measure of damages . . . will tend . . . to understate the social costs of breach.").

Accordingly, the court grants plaintiff's motion for partial summary judgment regarding TFC's "collateral reliance" interest in the amount of $42.166 million,[18] the capital TFC transferred to Transohio Savings as a result of the December 31, 1986 Transohio Rights Offering, subject to a final evidentiary hearing on damages.

c. **The Government Is Entitled To Establish Any Loss That Plaintiffs Would Have Suffered If FIRREA Had Not Been Enacted.**

■ In order to prevent the receipt of damages that would place the plaintiff in a "better position than [it] would have occupied had the contract been fully performed," the RESTATEMENT requires that damages based on reliance interest should be reduced by "any loss that the party in breach can prove with reasonable certainty [that] the injured party would have suffered had the contract been performed." *Bausch & Lomb*, 977 F.2d at 729 (quoting RESTATEMENT at § 349); *see also* FARNSWORTH, *supra* § 12.16 at 280 (stating reliance recovery may be reduced to the extent that the breaching party can prove "any benefit received [by the claimant] for salvage or otherwise.").

Therefore, as a matter of law, the Government is entitled to establish at an evidentiary

---

**17.** The author is currently the Chief Judge of the United States Court of Appeals for the First Circuit.

**18.** The court has not considered whether AMCAP is entitled to a portion of this amount based on its alleged ownership of First Global and that entity's 50.8% alleged ownership of 100% of TFC's stock.

hearing on damages any loss that plaintiffs would have suffered, if Transohio Savings would have been allowed to count the $107.5 million capital contribution as a permanent capital credit and amortize the entire $50 million in supervisory goodwill over a 25 year period. The burden is on the Government to establish any such loss with "reasonable certainty." *See* RESTATEMENT at § 352. In that regard, the court observes that the Government's burden is high since the Government's expert, R. Larry Johnson, has conceded that Transohio Savings met the new FIRREA regulatory capital requirements on December 31, 1989 and December 31, 1990. *See* Def.App. on Damages at 290 (citing 1989 Transohio Savings Bank Audited Financial Statements, note 20 and 1990 Transohio Savings Bank Audited Financial Statement, note 12). Any such established loss, however, will then be deducted from the reliance interest amounts identified in this memorandum opinion, prior to a final judgment being entered by the court.

The parties should be cognizant of the fact that the court agrees that the Government's default in the *Winstar* context should not make it an "insurer of the promisee's venture; yet it does not follow that the breach should not throw upon [the Government] the duty of showing that the value of performance would in fact have been less than the promisee's outlay. It is often very hard to learn what the value of the performance would have been; and it is a common expedient, and a just one, in such situations to put the peril of the answer upon that party who by [its] wrong has made the issue relevant to the rights of the other. On principle therefore the proper solution would seem to be that the promisee may recover his outlay in preparation for the performance, subject to the privilege of the promisor to reduce it by as much as he can show that the promisee would have lost, if the contract had been performed." *Armstrong Rubber*, 178 F.2d at 189; *see also Bausch & Lomb, Inc.*, 977 F.2d at 729 ("If the breaching party establishes that the plaintiff's losses upon full performance would have equaled or exceeded its reliance expenditures, the plaintiff will recover nothing under a reliance theory.").

### d. Restitution Is Not An Appropriate Remedy For Breach Of Contract In This Case.

■ Restitution is only available as a remedy for a total breach of contract. *See* FARNSWORTH § 12.19 at 325. As discussed herein and the court's October 31, 2003 memorandum opinion on liability, the August 29, 1986 Assistance Agreement had several key provisions, including: the transfer of Citizens/Dollar's assets and liabilities to Transohio; FSLIC's promise to indemnify plaintiffs and Transohio for certain claims and potential losses; and FSLIC's agreement to purchase $42.5 million of certain Citizens' assets at book value. *See* Pl.App. at 228–92. The record reflects that the Government "made good" on these portions of the Assistance Agreement. Therefore, the Government's breach concerns the loss of the "permanent" use of the $107.5 million capital credit towards Transohio Savings' regulatory net worth and the amortization of the $50 million in supervisory goodwill over a 25 year period for the same purpose. *See American Capital I*, 58 Fed.Cl. at 409. Accordingly, since the Government's breach was not a total breach, as a matter of law, restitution is not an available remedy in this case. Therefore, plaintiffs' August 31, 2001 motion for partial summary judgment for restitution in the amount of Transohio Savings' equity value on August 29, 1986 is denied and the Government's January 5, 2004 cross-motion for partial summary judgment as to restitution is granted.

In addition, the governing precedent in the Federal Circuit precludes restitution "in any amount contributed voluntarily, beyond [plaintiff's] contractual obligations." *Castle*, 301 F.3d at 1340. In this case, plaintiffs have conceded that the $42.166 million of additional equity capital "did not constitute a performance that was required of Plaintiffs under the [Assistance Agreement] between the parties[.]" Pl. Mot. P.S.J. at 27. Therefore, as a matter of law, plaintiffs are not entitled to restitution in the amount of the $42.166 million contributed to Transohio Savings as additional capital, resulting from the December 31, 1986 Transohio Rights Offering.

■ As previously discussed, restitution also is not an available remedy where the injured party has fully performed and "all that remains is for the party in breach to pay a definite sum of money as the price of that performance." FARNSWORTH, *supra* § 12.20 at 335. Thus, although the Government did not owe Transohio Savings a "definite sum of money" at the time FIRREA was implemented by the regulators, it did owe Transohio Savings the ability to treat the $107.5 million capital contribution as a "permanent" capital credit towards its regulatory net worth requirement (*see* Pl.App. on Damages at 663) and to amortize the remaining approximately $43.5 million of the $50 million in supervisory goodwill over the next 22 years using the straight line method of depreciation. *Id.* at 663–64. The court sees no difference between the Government owing Transohio Savings approximately $151.0 million in cash or the ability to balance its books in a manner that treats this amount as an asset towards its regulatory net worth. *Id.; see also id.* at 673.

■ Finally, plaintiffs assert, as a matter of law, that they are entitled to restitution of the value of their equity in Transohio Savings at the time of the acquisition of Citizens/Dollar *and* damages based on their reliance interest in the capital contribution TFC made to Transohio Savings as a result of the Transohio Rights Offering. *See* Pl. Mot. P.S.J. at 4; *see also* Pl. P.H. Brief at 5. As a matter of law, plaintiffs cannot seek restitution in addition to damages for their reliance interest based on the same breach. As Professor Corbin has instructed:

Damages and restitution will not be given as concurrent remedies for the same injury. The plaintiff will not be given judgment for his money back and at the same time a judgment for the value of the performance promised him. This is not because there is any necessary inconsistency between the two remedies; it is merely because it is accepted social policy that an injured party should not be given both remedies for a single injury. There is no inconsistency in giving both remedies if the transaction is so clearly severable for remedial purposes that there is no danger of double reparation .... Whatever may be

supposed to be the true nature of the two remedies, *it is certain that damages and restitution are not both available as remedies for a single injury by breach of contract.*

12 CORBIN, *supra* § 1223 at 514–16 (interim ed.2002) (emphasis added).

### e. Restitution Is Not An Appropriate Remedy For Breach Of Contract In *Winstar* Cases.

The court is persuaded by the reasoning of our appellate court's decisions in *Glendale* and *LaSalle Talman* that restitution is not an appropriate remedy in *Winstar* cases for several reasons. *Accord Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 246 (D.C.Cir.1995) (observing "we need not consider whether relief that is solely restitutionary could be recovered under FIRREA."); *see also* 48 C.F.R. § 52.249–2 (the remedy for breach of a governmental contract by termination is reliance damages). As leading scholars have recognized, "drawing the line between the reliance and restitution interests is in the end a rather arbitrary affair." Fuller and Purdue, *supra* at 72. Nevertheless, the court has some thoughts regarding the distinction between these damages interests that may be useful.

First, the gains derived by the Government in the *Winstar* cases were largely speculative and indeterminate as the Federal Circuit has recognized. *See Glendale*, 239 F.3d at 1382. In fact, the real gain was delaying political accountability for federal regulators' interference with market forces.

Second, in *Winstar* the Supreme Court at several places in the decision speaks of the appropriate remedy for a breach when performance is prevented, as "damages," not restitution or some other equitable remedy. *See Winstar Corp.*, 518 U.S. at 843, 116 S.Ct. 2432 ("[W]e hold that the terms assigning the risk of regulatory change to the Government are enforceable, and that the *Government is therefore liable in damages for breach.*") (emphasis added); *see also id.* at 883, 116 S.Ct. 2432 (citing Note, *A Procedural Approach to the Contract Clause*, 93 YALE L.J. 918, 928–29 (1984) ("A damage remedy is superior to an injunction because damages provide ... the flexibility to impair contracts retroactively when the benefits exceed the costs. So

long as the victims of contract impairments are made whole through compensation[.]")); *id.* at 885, 116 S.Ct. 2432 ("[D]amages are always the default remedy for breach of contract.") (citing RESTATEMENT at § 346 cmt. a; FARNSWORTH, *supra* § 12.8); *id.* at 890, 116 S.Ct. 2432 ("There is no question ... that the Bank Board and FSLIC had ample authority to ... promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible.").

Finally, as Chief Judge Posner of the United States Court of Appeals for the Seventh Circuit has observed, "It makes a difference in deciding which remedy to grant whether the breach was opportunistic. If a promisor breaks his promise merely to take advantage of the vulnerability of the promisee in a setting ... where performance is sequential rather than simultaneous, we might as well throw the book at the promisor.... An attractive remedy in such a case is restitution [where] the promisor broke his promise in order to make money-there can be no other reason in the case of such a breach. We can deter this kind of behavior by making it worthless to the promisor, which we do by making him hand over all his profits from the breach to the promisee; no lighter sanction would deter." POSNER at § 4.8. In the court's judgment, the enactment and implementation of FIRREA was not an opportunistic breach. Therefore, the *Winstar* cases would appear to be more akin to the voluntary, but economically efficient breach, that Chief Judge Posner has recognized, where it is simply uneconomical for the defendant to complete performance of the contract. *Id.,* see also Richard Craswell, "Offer, Acceptance, and Efficient Reliance," 48 STAN. L. REV. 481 (Feb.1996) (considering efficient reliance as an implied economic rationale underlying both federal and state court decisions in contract cases).

### 5. The FDIC's Damage Interest In The Case.

### a. Pending Motions Concerning The FDIC's Damage Interest In This Case.

There are four motions concerning the FDIC's interest in this case that are still pending for the court's resolution: the FDIC's October 10, 2000 motion for partial summary judgment on liability; the Government's October 10, 2000 motion to dismiss the FDIC's complaint and for partial summary judgment on liability; and the FDIC's November 30, 2001 motion for partial summary judgment on damages.

In addition, on June 13, 2003, the Honorable Loren A. Smith issued an Order to Show Cause why the FDIC's claims should not be dismissed for lack of standing in light of the Federal Circuit's decision in *Admiral Financial Corp. v. United States,* 329 F.3d 1372 (Fed.Cir.2003), which held that where the FDIC's claims total less than the government's priority claim arising from advances made to satisfy deposit liabilities of the failed thrift, the case-or-controversy requirement is not met and the FDIC lacks standing. *See American Capital Corp. v. United States,* No. 95–523 at 1–2 (Fed. Cl. June 13, 2003) (Order to Show Cause).

On July 17, 2003, the FDIC filed a response to the June 13, 2003 Show Cause Order asserting that *Admiral Financial* is satisfied because the FDIC's claims in this case exceed the amount owed to FRF–RTC and that the FDIC anticipates that even the third-party creditors and Transohio shareholders will be paid if the FDIC recovers on its claim. *See* July 17, 2003 FDIC Response To Show Cause Order at 1. Specifically, the FDIC advised the court that its claim is for restitution in the amount of Transohio's equity value at the time the Assistance Agreement was entered and that the value of this claim was approximately $216 million, based on the testimony of FDIC's expert, Dr. Koch. *Id.* at 1–2. The FDIC, however, states that the interest due to the FRF–RTC on its subrogated claim is $63.42 million, which was already paid. *Id.* at 2. The FDIC estimated that the outstanding third party non-government creditors were owed $15 million. *Id.* In addition, the FDIC advised the court in a footnote that it intended to deduct $2 million " 'off the top' to cover funds advanced to date by the FRF–RTC as *direct expenses* were incurred ... [and an additional] ten percent

of the net damages award ... [to] be applied to cover some of the unallocated indirect expenses accumulated for *all goodwill litigation* (which totaled $35.8 million as of year-end 2002)." *Id.* at n. 1 (emphasis added). After such deductions, the FDIC would then honor: existing priority 6 claims for approved depositor claims in the amount of $325,646; existing priority 7 claims for post solvency interest in the amount of $380,809; and priority 9 claims for subordinated debt in the amount of $14,279,000. *Id.*

The FDIC submitted the following chart summarizing its projected distribution "an award of FDIC's full restitution claim in this case."

| | | |
|---|---:|---|
| Monetary AWARD: | $ 216 | million |
| LESS off-ledger litigation expenses: | − 23.4 | million |
| Balance: | = $ 192.6 | million |
| LESS admin expenses/projected ledger deficit (incl. interest on subrogated claim and other depositor/creditor claims): | − 63.8 | million |
| Balance: | = $ 128.8 | million |
| LESS outstanding priority 6/7 claims from pass-through receivership: | − 706,455 | |
| LESS priority 9 subordinated debt from pass-through receivership: | − 14,279,000 | |
| BALANCE: | = $ 113.8 | million |

July 17, 2003 FDIC Response To Show Cause Order at 3.

On August 1, 2003, the Government filed a reply regarding the Show Cause Order. *See* Aug. 1, 2003 Gov't Reply Regarding Show Cause Order. The Government claimed that the FDIC has not established a case or controversy and therefore its claim should be dismissed because restitution is unavailable in this case, *id.* at 2–10; the FDIC's expert's valuation is overstated, *id.* at 10–12; the FDIC has failed to account for "benefits Transohio [Savings] received from the claimed contracts," *id.* at 12–13; and the FDIC has ignored the receivership distribution scheme established by Congress with the enactment of 12 U.S.C. § 1821(d)(11) (1994). *Id.* at 13–16.

The Government further asserts, assuming *arguendo*, that the maximum potential damage award is $216,100,000 as the FDIC alleges, deducting the benefits Transohio Savings received from the transaction, as well as the FDIC's administrative and litigation expenses, would allow recovery only for the interest on FDIC's subrogated claim, leaving a negative balance, as set forth in the following chart:

| | | |
|---|---|---:|
| Maximum Potential Damage Award | | $216,100,000 |
| Less Benefits Received (cash payments) | − 149,000,000 [19] | |
| | | = $ 67,100,000 |
| Less FDIC Administrative and Litigation Expenses | − 23,400,000 | |
| | | = $ 43,700,000 |
| Less Interest on FDIC Subrogated Claim | − 63,400,000 | |
| | | = $(−19,700,000) |

Aug. 1, 2003 Gov't Reply Regarding Show Cause Order at 15.

On September 9, 2003, the FDIC filed a surreply in further response to the Show

**19.** The Government asserts that plaintiffs and Transohio received approximately $107.5 million of direct cash assistance from the FSLIC, $41.5 million for "covered asset purchases," and "the right to offset $66.6 million of taxable income with losses previously incurred by Dollar and Citizens, as well as future indemnification for certain losses." Aug. 1, 2003 Gov't Reply Regarding Show Cause Order at 12.

Cause Order. *See* Sept. 9, 2003 FDIC Sur-reply Regarding Show Cause Order. On October 2, 2003, the Government filed a re-sponse. *See* Oct. 2, 2003 Gov't Response Regarding Show Cause Order.

### b. The Effect Of This Memorandum Opinion On The FDIC's Standing.

Article III, § 2, of the United States Con-stitution "confines federal courts to the deci-sion of 'Cases' or 'Controversies.'" *Arizo-nans for Official English v. Arizona,* 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Constitutional standing is likewise a requirement in Article I federal courts, such as the United States Court of Federal Claims. *See Anderson v. United States,* 344 F.3d 1343, 1349–50 (Fed.Cir.2003). More-over, standing is a matter of subject matter jurisdiction; it cannot be waived. *See Land-mark,* 256 F.3d at 1380.

In *Admiral Financial,* the Federal Circuit set forth the following test to determine whether the FDIC has standing to intervene as a party in a *Winstar* case:

> "*where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satis-fied....*" [T]he critical question is whether claims being asserted by the FDIC and claims being asserted by the plaintiff—which the FDIC asserts are derivative claims—total less than the government's priority claim arising from advances made to satisfy deposit liabilities of the failed thrift. If they do, the case-or-controversy requirement is not met and the FDIC lacks standing. It is not necessary to de-termine the correct ownership of claims being asserted by the plaintiff that the FDIC asserts it owns as the successor to the failed thrift.

*Id.* at 1382 (quoting *Landmark,* 256 F.3d at 1382) (emphasis added).

The FDIC has asserted a claim for breach of contract based on a theory of restitution. *See* FDIC Mot. P.S.J. on Damages at 2 ("FDIC joins in ACC's Motion [that restitu-tion of $216.1 million should be awarded] to the extent that ACC urges that Transohio suffered $216.1 million in damages as a result of the Government's breach."); *see also id.* at 6–7 (arguing restitution as the basis for granting the FDIC's motion). In light of the court's memorandum opinion today, the FDIC's restitution claim is now ripe to be dismissed. In the interest of justice, howev-er, the court will grant the FDIC 30 days leave in which to amend its complaint specifi-cally to conform to the court's rulings herein.

It is the court's present view that the evidentiary hearing on damages will focus primarily on the Government's expert testi-mony and documentary evidence to establish whether Transohio Savings would have had survived, even if it had received all the finan-cial benefits of the August 29, 1986 Assis-tance Agreement. The court also will allow plaintiffs to proffer the testimony of the FDIC's expert if it wishes to still pursue an alternative calculation of TFC's "essential re-liance" interest. The court will allow the FDIC to participate in the evidentiary hear-ing and any further briefing, as if it were party, but it is the court's inclination not to reach the substance of the outstanding mo-tions regarding the FDIC until the time a final judgment is entered regarding dam-ages.

### CONCLUSION

Therefore, for the aforegoing reasons, the court **GRANTS** plaintiffs' August 31, 2001 motion for partial summary judgment re-garding TFC's "essential reliance" interest and "collateral reliance" interest, however, since the Government is entitled as a matter of law to establish any loss that plaintiffs would have suffered if Transohio Savings had received the full benefit of $107.5 million as a capital credit toward its regulatory net worth and complete amortization of $50 million in supervisory goodwill for the full 25 year peri-od on a straight line basis, a final judgment will not be entered until an evidentiary hear-ing on damages is held. During the week of March 8, 2004, the court will schedule a telephone conference with counsel for the parties and the FDIC to ascertain a conve-nient date to set this hearing.

In addition, the court **DENIES** plaintiffs' motion for partial summary judgment as to

restitution and **GRANTS** the Government's January 5, 2004 cross-motion for partial summary judgment as to restitution.

In the interest of justice, the court will grant the FDIC 30 days leave in which to amend its complaint specifically to conform to the court's rulings herein.

**IT IS SO ORDERED.**