**AMERICAN CAPITAL CORPORATION and Transcapital Financial Corporation, Plaintiffs,**

and

**Federal Deposit Insurance Corporation, as Successor to the Rights of the Transohio Savings Bank, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

No. 95–523C.

United States Court of Federal Claims.

April 27, 2005.

Charles J. Cooper, Michael W. Kirk, Vincent J. Colatriano, and Hamish P.M. Hume, Washington, D.C., for plaintiffs.

William F. Ryan, Jane M.E. Peterson, Jeffrey Hughes, and Jeffrey T. Infelise, Washington, D.C., for defendant, United States Department of Justice.

Andrew Charles Gilbert, Washington, D.C., for plaintiff-intervenor, Federal Deposit Insurance Corporation.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S NOVEMBER 17, 2003, MARCH 12, 2004, AND FEBRUARY 25, 2005 MOTIONS FOR RECONSIDERATION

BRADEN, Judge.

This Memorandum Opinion and Order addresses the defendant's ("Government") November 17, 2003, March 12, 2004, and February 27, 2005 Motions for Reconsideration. *See* RCFC 59; *Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1583 (Fed. Cir.1990) ("The decision whether to grant reconsideration lies largely with the discretion of the [trial] court.").

### I. The Government's November 17, 2003 Motion For Reconsideration.

#### A. Procedural Background.

On November 17, 2003, the Government filed a Motion for Reconsideration ("11/17/03 Gov't Mot. to Reconsider") of five "issues" in the court's October 31, 2003 Memorandum Opinion and Order in *American Capital Corp. v. United States,* 58 Fed.Cl. 398 (2003) ("*American Capital I*"). On December 19, 2003, plaintiffs filed a Response. On January 23, 2004, the Government filed a Reply.

#### B. Resolution Of The Government's November 17, 2003 Motion For Reconsideration.

█ The first issue on which the Government seeks reconsideration of *American Capital I* is whether plaintiff, American Capi-

tal Corp., as a holding company, can state a claim upon which relief may be granted "by seeking a guarantee against the risk of loss in the absence of government authority to make such a guarantee." 11/17/03 Gov't Mot. to Reconsider at 1; *see also id.* at 2–6. In *American Capital I,* 58 Fed.Cl. at 408, the court determined that the Secretary of the FHLBB and Director of the Federal Savings and Loan Insurance Corporation ("FSLIC") "were representatives of the United States with authority to bind the Government." The Government, however, claimed that the court erred in not directly addressing the authority of the Federal Home Loan Bank Board ("FHLBB") to enter into the August 29, 1986 Assistance Agreement. *See* 11/17/03 Gov't Mot. to Reconsider at 3. But, the court addressed this issue. In *United States v. Winstar Corp.,* 518 U.S. 839, 890, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the United States Supreme Court held that "the [FHLBB] and FSLIC had ample statutory authority to ... promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible." In *American Capital I,* 58 Fed.Cl. at 408, the court specifically cited to *Winstar* as settled authority regarding the authority of the FSLIC and FHLBB to enter into contracts like the August 29, 1986 Assistance Agreement in this case. Moreover, the Government's argument concerning *Schism v. United States,* 316 F.3d 1259 (Fed.Cir.2002) (*en banc*), *cert. denied,* 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003), is irrelevant as that case held under 5 U.S.C. § 301 that the Air Force Secretary lacked authority to promise free and full medical care to recruits. *Schism,* however, did not construe 12 U.S.C. § 1725(c) (repealed by FIRREA) (authorizing the FSLIC, operated by the FHLBB, "[t]o make contracts," the statutory authority central to the United States Supreme Court's holding in *Winstar*). For these reasons, the Government's November 17, 2003 Motion for Reconsideration concerning the authority of the FSLIC and FHLBB to enter contracts is denied.

■ The second basis for reconsideration concerns the effect of *Transohio Savings Bank v. Director, OTS,* 967 F.2d 598, 620 (D.C.Cir.1992), a decision that the Government argues bars plaintiffs' contract claims in this case. *See* 11/17/03 Gov't Mot. to Reconsider at 1; *see also id.* at 6–10. As a threshold matter, the Government waived the defense of collateral estoppel by not asserting it in the September 22, 1999 Answer or raising this issue in any motion or brief prior to seeking reconsideration. *See Arizona v. California,* 530 U.S. 392, 410, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) (holding that "an affirmative defense [is] ordinarily lost if not timely raised."); *see also* RCFC 8(c), 12(b). In addition, since the United States Court of Appeals for the D.C. Circuit specifically ruled that plaintiffs' breach of contract claim for money damages only could be brought in the United States Court of Federal Claims, the United States Court of Appeals for the D.C. Circuit's decision has no collateral estoppel effect on this case. *See Transohio Savings,* 967 F.2d at 607–13; *see also Transcapital Financial Corp. v. Director, OTS,* 44 F.3d 1023, 1025 (D.C.Cir. 1995) ("[O]ur prior *Transohio* decision did not limit, and indeed could not have limited, Appellants' right to seek compensation in the [United States] Federal Court of Claims."). Accordingly, the Government's November 17, 2003 Motion for Reconsideration regarding the application of collateral estoppel is denied as completely without merit.

The third basis for reconsideration concerns whether "the FHLBB Resolution approving Transohio [Savings Bank's ("Transohio" or "Transohio Savings")] bid proposal for a merger transaction can properly be considered an 'offer' for the purpose of contract analysis." 11/17/03 Gov't Mot. to Reconsider at 2; *see also id.* at 11–12. An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) CONTRACTS ("RESTATEMENT") § 24 (1981). Thus, as the court recognized, the acceptance of an offer may be manifested by "assent to the terms thereof made by the offeree in a manner invited or required by the offer." *American Capital I,*

58 Fed.Cl. at 407 (citing RESTATEMENT § 50(1)). Since the August 29, 1986 Assistance Agreement incorporated "a resolution or action of the [FHLBB] approving, or adopted concurrently with, this Agreement," it manifested acceptance of the offer contained in FHLBB Resolution 86–864. *See Winstar,* 518 U.S. at 890, 116 S.Ct. 2432 (recognizing that the FHLBB and FSLIC had authority to enter into a contract allowing capital credits and supervisory goodwill to be recognized as an asset in determining a party-institution's regulatory compliance). Accordingly, the Government's November 17, 2003 Motion for Reconsideration of the court's determination that FHLBB Resolution 86–864 constituted a *bona fide* offer is denied.

The fourth basis for reconsideration questions whether the September 10, 1986 Forbearance Letter is part of the August 29, 1986 Assistance Agreement. *See* 11/17/03 Gov't Mot. to Reconsider at 2; *see also id.* at 12–15. Since the court was clear that it did not consider it necessary to adjudicate the legal effect of the September 10, 1986 Forbearance Letter, this portion of the Government's Motion for Reconsideration is irrelevant and, as such, is denied. *See American Capital I,* 58 Fed.Cl. at 406 n. 7.

The fifth basis for reconsideration implies that the court concluded that the imposition of an Individual Minimum Capital Requirement ("IMCR") on Transohio Savings constituted a total breach and if so, the court erred in holding that the breach was caused by the application of the new Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") capital standards. *See* 11/17/03 Gov't Mot. to Reconsider at 2; *see also id.* at 15–17. The court determined that the enactment of FIRREA and implementation thereof by the Office of Thrift Supervision ("OTS") was a material breach of the terms of the August 29, 1986 Assistance Agreement in that the $107.5 million capital credit "would be recognized as an asset in determining Transohio's compliance with regulatory requirements ... [and] the FHLBB and FSLIC's agreement to allow Transohio to count [$50 million] amortized supervisory goodwill for the same purpose

... [and thus] deprived plaintiffs and Transohio of the full benefit of their contractual bargain." *American Capital I*, 58 Fed.Cl. at 409. The court discerns nothing inconsistent with this determination regarding a material breach of the August 29, 1986 Assistance Agreement and the court's recognition that the subsequent imposition of the IMCR by "OTS abrogated the entire value of the Assistance Agreement[.]" *Id.* The IMCR ensured that Transohio Savings could not take any action to mitigate or reduce losses incurred as a result of the breach as the institution effectively was put out of business since it could not meet the requirements of the IMCR. Therefore, the Government's November 17, 2003 Motion for Reconsideration regarding the court's characterization of the IMCR is denied.

## II. The Government's March 12, 2004 Motion For Reconsideration.

### A. Procedural Background.

On March 12, 2004, the Government filed a Motion for Reconsideration ("3/12/04 Gov't Mot. to Reconsider") of seven "issues" in the court's February 27, 2004 Memorandum Opinion and Order in *American Capital Corp. v. United States*, 59 Fed.Cl. 563 (2004) ("*American Capital II*"). Plaintiffs reserved their right to respond at the time the court considered the March 12, 2004 Motion. On April 13, 2005, the court informed the parties to submit any further briefing in short order. On April 14, 2005, plaintiffs declined to submit any further briefing because "Questions 2–7 have either been rendered moot or simply are not material to the Court's analysis of reliance damages as discussed in its February 2004 summary judgment decision or its January 2005 damages decision." 4/14/05 e-

mail from Mr. Charles Cooper to Ms. Elizabeth Clements. Regarding Question 1, "plaintiffs believe this question has already been exhaustively addressed ... [m]oreover, since the filing of the Government's March 12, 2004 Motion the Federal Circuit has issued a decision that confirms the correctness of the court's decision with respect to this issue. *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed.Cir.2004)." *Id.*

### B. Resolution Of The Government's March 12, 2004 Motion For Reconsideration.

■ The first issue raised by the Government concerns: "Whether shareholder plaintiffs can recover directly as damages in a breach of contract case the equity of the corporation in which they own stock." *See* 3/12/04 Gov't Mot. to Reconsider at 1; *see also id.* at 3–12. The Government is correct that the court did not expressly address that issue, because plaintiff, Transcapital Financial Corporation ("TFC"), did not seek the equity of a corporation in which it owned stock as damages. Instead, as discussed in *American Capital II*, the court ruled that because of the breach, TFC was entitled to its essential reliance interest, which includes "expenditures made ... in performance [of the August 29, 1986 Assistance Agreement]." *American Capital II*, 59 Fed.Cl. at 582 (citing RESTATEMENT § 349). Moreover, over half of the cases cited in the Government's March 12, 2004 Motion for Reconsideration concern a shareholder's standing to seek damages for tort injury inflicted on a corporation and have no relevance to the standing of a party to a contract to sue for breach, where the Government has a "special duty," and to seek an appropriate remedy. *See* 3/12/04 Gov't Mot. to Reconsider at 3–12.[1]

---

1. *Compare, e.g., Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir.2002) (holding, under Maryland law, that a breach of fiduciary duty claim alleging loss in share value, shareholder must allege an injury distinct from an injury to the corporation); *Official Committee of Unsecured Creditors v. R.F. Lafferty, Inc.*, 267 F.3d 340, 348 (3d Cir.2001) (holding, under Pennsylvania law, that "where fraud, mismanagement, or other wrong damages a corporation's assets, a shareholder does not have a direct cause of action [however] a corporation can suffer an injury unto itself, and any claim it asserts to recover for that injury is inde-

pendent and separate from the claims of shareholders, creditors, and others."); *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 160 (7th Cir.1996) (holding, under Illinois law, that "[i]njury to the corporation, does not ... prevent suit by an investor who suffers a distinct personal injury[.]"); *Gwartz v. Jefferson Memorial Hospital Assoc.*, 23 F.3d 1426, 1429 (8th Cir.1994) (holding that professional corporation was not "necessary" party where plaintiff asserts claims that accrue to plaintiff personally); *Crocker v. Federal Deposit Ins. Corp.*, 826 F.2d 347, 349–50 (5th Cir.1987) (recognizing an exception, under Mis-

And, none of the *Winstar*-related cases cited by the Government directly address under what circumstances a shareholder has standing to seek reliance interests. *See* 3/12/04 Gov't Mot. to Reconsider at 3–12.[2] One *Winstar*-related case cited by the Government, however, subsequently reversed by the United States Court of Appeals for the Federal Circuit, held that the trial court erred in dismissing plaintiffs' claims for expectancy and reliance damages because the direct harm caused by the Government's breach was separate and distinct from any harm flowing through the corporation to the plaintiffs as shareholders. *See La Van v. United States*, 382 F.3d 1340, 1350 (Fed.Cir.2004). Like plaintiffs in *La Van* that were in privity of contract with the Government and were held to have standing to seek damages for injuries that are separate and distinct from the injury to the corporation, in this case

TFC was in privity as a signatory to the August 29, 1986 Assistance Agreement, "put on the table" Transohio Savings' equity with a book value of $126.479 million as partial consideration, and authorized, as promised, an additional $42.166 million to capitalize Transohio Savings. *See American Capital II*, 59 Fed.Cl. at 580–84. Therefore, TFC was "essential" to the transaction and the reliance interests that it seeks are unique to TFC and separate and distinct from injury incurred by Transohio Savings. *See La Van*, 382 F.3d at 1350; *see also Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1316 (Fed.Cir.2004) (acknowledging that if the trial court determines the breach was total, plaintiff may recover "restitution of the value of the stock . . . the Hansens are not barred, as a matter of law, from advancing a restitution claim arising out of the exchange of their

sissippi law, to the rule that "a shareholder may maintain a nonderivative action for the violation of a duty owed directly to the shareholder as an individual[,]" but holding shareholder's breach of fiduciary duty and misrepresentation claims were too speculative to qualify as individual injury to a shareholder); *Gaff v. Federal Deposit Ins. Corp.*, 814 F.2d 311, 317–18 (6th Cir.1987) (holding that damages resulting from directors' misconduct destroying the value of the corporate stock does not qualify as a direct or personal injury to a shareholder and will not support a tort action); *with Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1194–95 (7th Cir.1985) (noting exceptions to general rule that a stockholder has no individual right of action "such as where a special contractual duty exists between the wrongdoer and shareholder or where the shareholder suffers an injury separate and distinct from that suffered by other shareholders," but holding that plaintiff failed to state a cognizable claim, under Spanish law, arising out of bank's alleged failure to provide agreed financing to corporation.); *Slovick v. Gannet Co., Inc.*, 1985 WL 3105, *2 (N.D.Ill.1985) (recognizing an exception to the general rule precluding shareholder suits for injuries to the corporation where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, but holding that, under Illinois law, where plaintiff's complaint alleges dissipation of stock due to mismanagement of the corporation, the real harm is to the corporation, not the plaintiff); *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 883 (Iowa 1983) ("In order to bring an individual cause of action for direct injuries a shareholder must show that the third-party owed him a special duty or that he suffered an injury separate and distinct from that suffered by the other shareholders.").

2. *See Anderson v. United States*, 344 F.3d 1343, (Fed.Cir.2003) (holding that beneficiaries of a trust that signed an agreement with the FHLBB, were not in privity or have third-party beneficiary status because the Government did not make any promises expressly intended to benefit them); *see also Holland v. United States*, 63 Fed.Cl. 147, 149–50 (2004) (reversing earlier holding that plaintiffs' increased cost of borrowing money to acquire thrift was an injury separate and distinct from the injury to the corporation, because newly-formed corporation incurred the increased cost of borrowing money, not individual plaintiffs); *Hometown Financial, Inc. v. United States*, 56 Fed.Cl. 477, 484–86 (2003), *appeal docketed*, No. 04–5116 (Fed.Cir. July 12, 2004) (holding that shareholders that made a capital contribution to acquire a failing thrift were entitled to restitution, but lacked standing directly to recover lost profits, and denying the Government's motion to dismiss plaintiff's claim for reliance interest); *Statesman Savings Holding Corporation v. United States*, 41 Fed.Cl. 1, 15–16 (1998) (stipulated judgment entered July 21, 1998) (holding that because private plaintiffs were signatories of a breached contract, they were entitled to recovery independent from that of the corporation, but denying expectancy damages claim and not addressing claim for reliance damages); *Far West Federal Bank S.B. v. Director, Office of Thrift Supervision*, 787 F.Supp. 952, (D.Or.1992), *aff'd*, 119 F.3d 1358 (9th Cir.1997) ("This is not a case where a group of shareholders has appropriated a claim rightfully belonging to the corporation in which they hold an interest. To the contrary, they seek redress for the loss of contractual rights arising under the Conversion Agreement— rights that are held by, and inure to the benefit of, plaintiffs, both as a group and individually.").

Raritan stock."); *Landmark Land Co., Inc. v. Federal Deposit Ins. Corp.,* 256 F.3d 1365, 1370 (Fed.Cir.2001) (affirming the trial court's award of $21.5 million in restitution representing real estate and cash contributed to capitalize two failing thrifts acquired by a contract with the FSLIC in exchange for the promise that supervisory goodwill could be applied to meet regulatory capital requirements).

The Government also misconstrues *Castle v. United States,* 48 Fed.Cl. 187 (2000) for the proposition that shareholders of a corporation may not recover directly the expectancy or diminished stock value damages of a thrift, even when in privity of contract with the government. *See* 3/12/04 Gov't Mot. to Reconsider at 6. In fact, the trial court held that plaintiffs-shareholders had standing to sue not because of a privity relationship, but as third-party beneficiaries for expectancy damages, and only on behalf of the bank and for restitution damages. *Id.* at 199–200. The United States Court of Appeals for the Federal Circuit reversed holding that plaintiffs-shareholders did not have standing to sue as third-party beneficiaries to the contract for restitution since none of the alleged contractual promises conferred benefits upon them independent of their status as shareholders. *See Castle v. United States,* 301 F.3d 1328, 1332 (Fed.Cir. 2002). In this case, plaintiffs-shareholders are not seeking restitution; only TFC's claim for reliance interests are at issue. Therefore, the Government's March 12, 2004 Motion for Reconsideration questioning TFC's contractual standing and separate and distinct nature of a recovery based on reliance interests is denied.

The second issue raised seeks the court's consideration of whether TFC is a third party beneficiary to the FHLBB Resolution 86–864, even though the court plainly stated that the "legal effect of the forbearance letter need not be determined here." *American Capital I,* 58 Fed.Cl. at 406 n. 7. The Government's motion in this regard is irrelevant and is denied. *See* 3/12/04 Gov't Mot. to Reconsider at 12–16.

The third issue challenges the court's description of the $107.5 million capital contribution as a permanent capital credit. *See* Gov't Mot. to Reconsider at 16–18; *see also American Capital II,* 59 Fed.Cl. at 585. The Government is correct that this issue was settled in *American Capital I,* 58 Fed.Cl. at 405 and the court hereby amends *American Capital II,* 59 Fed.Cl. at 585, to delete the word "permanent" where it appears in the first and second paragraphs.

The fourth issue seeks the court's reconsideration of the statement that "[t]he court sees no difference between the Government owing Transohio Savings approximately $157.5 million in cash or the ability to balance its books in a manner that treats this amount as an asset towards its regulatory net worth." *See American Capital II,* 59 Fed. Cl. at 586; *see also* 3/12/04 Gov't Mot. to Reconsider at 18–19. The court does not read this statement to suggest, as the Government asserts, that the "value of the intangible asset, goodwill, which amortizes and cannot be invested, is equivalent to cash[.]" *See* 3/12/04 Gov't Mot. to Reconsider at 18. In any event, since this statement was made in the context of the court's analysis of why restitution is not an appropriate remedy for breach of contract in this case, which neither party claims was an error, the court denies this basis for reconsideration as moot.

Since the Government's fifth, sixth, and seventh bases for reconsideration are related, they will be considered together. *See* 3/12/04 Gov't Mot. to Reconsider at 20–22. Here the Government challenges: the court's invitation to allow the FDIC to participate in the evidentiary hearing and briefing after ruling that the FDIC's restitution claim was dismissed; the FDIC's representation that interest due to the FRF–RTC on its subrogated claim of $63.42 million was already paid; and plaintiff's use of the FDIC expert, Dr. Koch. *See* 3/12/04 Gov't Mot. to Reconsider at 20–22. Since the FDIC did not participate in the subsequent proceedings and there was no need to ascertain the status of interest paid to the FRF–RTC and plaintiff did not call or rely on Dr. Koch's expert report at the evidentiary hearing nor did the court, these bases for reconsideration also are denied as moot.

## III. The Government's February 25, 2005 Motion For Reconsideration.

### A. Procedural Background.

On January 19, 2005, the court issued a Memorandum Opinion and Order awarding TFC $109.309 million based on its essential and collateral reliance interests. *See American Capital Corp. v. United States,* 63 Fed. Cl. 637, 715 (2005) (*"American Capital III"*). On January 28, 2005, the court convened a telephone status conference, wherein the court and plaintiffs' counsel were advised that the Government intended to file a motion for reconsideration of *American Capital III.* During that conference, the court asked the parties also to address the relevance of *California Federal Bank v. United States,* 395 F.3d 1263 (Fed.Cir.2005), a decision issued by the United States Court of Appeals for the Federal Circuit on January 19, 2005, the same date the court issued *American Capital III.* A briefing schedule was established by an order entered on February 4, 2005. On February 25, 2005, the Government filed a Motion for Reconsideration ("2/25/05 Gov't Mot. to Reconsider") identifying four mistakes of law that the Government argues "cause[d] the court to overestimate damages." *See* 2/25/05 Gov't Mot. to Reconsider at 8.[3] On March 31, 2005, plaintiffs filed a response ("Pl.Resp.").

### B. Resolution Of The Government's February 25, 2005 Motion For Reconsideration.

■ First, the Government objects to "the Court's decision to place upon us the burden of disproving that alleged losses were related to the breach." 2/25/05 Gov't Mot. to Reconsider at 8 n. 10. The court has never made such a ruling nor did the Government cite any decision that so stated. Instead, the court faithfully has followed and applied the rule on how to calculate damages based on reliance interest, which assigns the Government as "the party in breach [to] prove with reasonable certainty [the amount of any loss that] the injured party would have suffered had the contract been performed." RESTATE-MENT § 349. Accordingly, when the Government established with reasonable certainty that the loss claimed by plaintiff "would have [been] suffered had the contract been performed" that loss was deducted from plaintiffs' reliance interest. *See American Capital III,* 63 Fed.Cl. at 698–99 (determining that the Government established with reasonable certainty that net losses of $19.846 million would have been incurred by Transohio Savings in fiscal year 1989 irrespective of the breach); *see also id.* at 701–04 (determining that the Government established with reasonable certainty that net losses of $11.69 million would have been incurred by Transohio Savings in fiscal year 1990 irrespective of the breach); *see also id.* at 709 (determining that the Government established with reasonable certainty that net losses of $18.8 million would have been incurred by Transohio Savings in fiscal year 1991 irrespective of the breach). Therefore, the Government's motion for reconsideration regarding the Government's burden under RESTATEMENT § 349 is denied.

■ Second, the Government argues that Transohio Savings' loan losses of $38.4 million, mortgage banking losses of $15 million, and mortgage derivative losses of $9.7 million should be deducted from TFC's reliance interests for fiscal year 1991. *See* 2/25/05 Gov't Mot. to Reconsider at 8–10. The Government insists that the $38.4 million of loan losses was a "stand-alone loss, entirely unrelated to any shrink in assets." 2/25/05 Gov't Mot. to Reconsider at 9 (citing DX 613 at 38 (Transohio Savings Bank Form 10–K for fiscal year ending December 31, 1991)). The Government fails to acknowledge, however, that the record established that $38.4 million of loan losses were not actual dollar losses, but instead an accounting entry made to reflect a "possible loss." *Ipso facto,* "possi-

---

3. The Government also noted six mistakes of fact in *American Capital III,* but conceded that "not all ... affected the Court's damages calculation[.]" *See* 2/25/05 Gov't Mot. to Reconsider at 3. Although none of these mistakes affected the court's legal determination regarding TFC's reliance interests, the court will respond to certain of the Government's comments by clarifying relevant portions of the factual discussion and making other editing corrections in a Final Decision, to be issued when plaintiffs' pending claims under the Just Compensation Clause of the Fifth Amendment to the United States Constitution are adjudicated or voluntarily dismissed.

ble losses" are not losses that the Government can establish with "reasonable certainty," because an economic out-of-pocket loss has not yet occurred. *See American Capital III,* 63 Fed.Cl. at 709 (citing DX 613 at WON537 2228) (Transohio Savings Bank Form 10–K for fiscal year ending December 31, 1991: "TRANSOHIO's operating results were adversely affected in 1991 by the continued deterioration of its commercial real estate portfolio.... The provision for *possible losses* on loans increased ... during 1991[.]") (emphasis added); *see also id.* at DX 613 at WON537 2231–32 ("TRANSOHIO's provision for *possible losses* on loans for 1991 was $38.4 million.... In accordance with OTS regulations and industry practice, TRANSOHIO has an asset review and classification procedure as part of its normal activities.... Assets that do not yet warrant the more adverse classifications, but possess credit deficiencies or potential risk deserving management's close attention, are designated as special mention. Assets classified as substandard or doubtful require the establishment of prudent general valuation allowances, while assets classified as loss require specific valuation allowances of 100% of the amount classified or a charge-off of such amount.") (emphasis added). Transohio Savings' assets that were classified as a loss were treated accordingly, but none of the $38.4 million "possible" losses required "specific valuation allowances of 100%" or a "charge-off" and none was made. *Id.; see also id.* at 710 (quoting TR at 2772–74) (Steven R. Cook, Senior Vice President and Chief Financial Officer of American Capital Corp. and Transcapital Financial Corporation and a former Director of Transohio Savings, testified that: "[W]hen you book a loan loss ... you are not giving up anything economically. You are making an accounting entry. And when you foreclose on that loan or rehabilitate or whatever you do and convert it to cash, you always get to conform your final accounting to the economic realization."). Therefore, the Government's motion for reconsideration of the $38.4 million of "possible" loan losses for fiscal year 1991 is denied, as the Government did not meet its burden of proof under RESTATEMENT § 349. The court's Final Decision will incorporate this reasoning to further clarify this point.

■  The Government also seeks reconsideration of the court's determination that the Government did not establish with reasonable certainty that $15 million of mortgage banking losses in fiscal year 1991 would have been incurred by Transohio Savings irrespective of the breach. *See* 2/25/05 Gov't Mot. to Reconsider at 9–10. Transohio Savings characterized these mortgage banking losses in this manner: "The decreasing interest rate environment resulted in significant mortgage loan prepayments. As a result of this, amortization of excess servicing fees receivable ... increased ... over 1990." *See American Capital III,* 63 Fed.Cl. at 709 (citing DX613 at WON537 2228 (Transohio Savings Bank Form 10–K for fiscal year ending December 31, 1991)). As an initial matter, although several witnesses mentioned that interest rates increased some time in the late 1980's and early 1990's, there is no definitive evidence in the record about what the interest rate environment was in 1991 nor the factors that attributed to any change in the interest rate that occurred after the 1989 breach, nor did the parties request that the court make any such findings or take judicial notice of the interest rate environment in 1991. In addition, there is no evidence in the record that all $15 million reported as mortgage banking losses were caused by any decrease in interest rates and reflect anything other than a bookkeeping entry. Moreover, the Government's claim that "all related testimony demonstate[s] the increased amortization resulted from '[t]he decreasing interest rate environment,'" is overstated. *See* 2/25/05 Gov't Mot. to Reconsider at 9 (citing TR at 3469 testimony of Mr. William D. Snider, former Vice President and Chief Financial Officer of Transohio Savings and TR at 3023–29 testimony of the Government's expert, Dr. William G. Hamm, Managing Director of the Public Policy Practice at LEGG, LLC).

An examination of Mr. Snider's testimony reveals that he did not attribute the $15 million loss incurred by Transohio Savings in fiscal year 1991 to increased amortization or to a decreasing interest rate environment.

GOVERNMENT'S COUNSEL: So the supplemental amortization of purchased mortgage servicing rights that we have taken a look at, that had nothing to do with the phaseout of goodwill, would you agree with that?

MR. SNIDER: Hmm, well, I don't know. I don't know if I can directly answer that or not. I would have to think about that. Just talk about it some more, and then we will-I just, you know-

THE COURT: It is a business meeting. He wants to negotiate with you.

MR. SNIDER: It is a long stretch, I think.

THE COURT: Make him an offer he can't refuse.

GOVERNMENT'S COUNSEL: The primary factor deriving the supplemental amortization is, as you stated, the assumptions you made when you first booked them, and then the interest prepayments, the increase in prepayments?

THE COURT: Is that a question or is that your testimony?

TR at 3468-69.

\* \* \* \* \* \*

Mr. Snider also did not testify that the "primary factors" driving the supplemental amortization "resulted from a decreasing interest rate environment" or the cause of the $15 million losses incurred were attributed solely to increased amortization. Instead, Mr. Snider simply confirmed that the Government's counsel's reading of the Transohio Savings' Form 10-K for fiscal year 1991 into the record was accurate.

GOVERNMENT'S COUNSEL: The primary factors driving the supplemental amortization of purchased mortgage servicing rights is, as you have testified, the assumptions you make when you first book them and then the increase in prepayment speeds?

MR. SNIDER: No, not the increase. The actual compared to the assumptions. Yeah, whichever way it goes, actual compared to assumptions when you booked it.

GOVERNMENT'S COUNSEL: Okay. The effect that interest rates have on purchased mortgage servicing rights, is similar to the effect that it has, that declining interest rates have on the IO strips, is that right?

MR. SNIDER: They are similar, yes.

GOVERNMENT'S COUNSEL: Okay. And just to follow up on that, if you could turn to-actually, should be already in front of you DX 613, which is the 1991 10K.

MR. SNIDER: Okay.

GOVERNMENT'S COUNSEL: And if you turn to page 38.

MR. SNIDER: Okay, I got it.

GOVERNMENT'S COUNSEL: And in that second paragraph, this is the one we read before, and it talks about the decreasing interest rate environment. And in this paragraph, Transohio talks about how the decrease in interest rate environment resulted in significant mortgage loan prepayments. That is in the middle of the paragraph.

MR. SNIDER: Yes.

GOVERNMENT'S COUNSEL: And it talks about the amortization of excess servicing fees receivable, and purchased mortgage servicing rights in the next sentence?

MR. SNIDER: Yes.

GOVERNMENT'S COUNSEL: And then it also talks about the lost 26.7 million on certain mortgage derivative investments in the next sentence?

MR. SNIDER: Yes.

TR at 3470-71.

Likewise, the Government misstates the import of Dr. Hamm's expert testimony.

GOVERNMENT'S COUNSEL: The next item mentioned in the second paragraph on page 38 is an increase in amortization expense of excess servicing fees receivable in purchased mortgage servicing rights of 36.7 million dollars over 1990. What's your basis for saying that's unrelated to the breach?

DR. HAMM: Well, because these losses are a combination of two factors. Number one, an aggressive way of accounting for servicing and, number two, as the sentence describing this loss indicates the decreasing interest rate environment. If I could just take a minute to try to put this in

English. GAAP gives a thrift two different, two alternatives for accounting for servicing value. When you, for example, go out into the market and you buy a, the servicing rights to a portfolio GAAP allows a thrift to in effect calculate the present value of the servicing income and then deduct from that present value the present value of the cost of servicing and count the difference as income. That's a very aggressive way of accounting for servicing rights.... But GAAP does permit this form of accounting. And the problem is that when you make these estimates you don't know how long that loan is going to be outstanding and thus generating servicing income. I know at one point Transohio was assuming that the loans would be on the books for 12 years and so it would be discounting 12 years worth of servicing fees back to day one and reflecting that as revenue.... So this loss of 36.7 million dollars essentially is taking away income that had previously been booked. But the reason that it came off the income statement was because of the accounting approach that Transohio adopted and what Mr. Greenspan and the Federal Reserve Board of Governors did in terms of moving interest rates down at the time. Has nothing to do at all with the phase out of goodwill.

TR at 3023–25.

Dr. Hamm did not testify that the $15 million in mortgage banking losses incurred by Transohio Savings in 1991 were attributed solely to increased amortization resulting from a decreasing interest rate environment. Instead, Dr. Hamm surmised that these losses were attributed to an accounting decision. Nor did Dr. Hamm testify that the decision to book this amount as a loss was made irrespective of shrinkage caused by the breach, i.e., the forced sale of Transohio's most attractive assets, such as the mortgage-backed securities, necessitated by the Gov-

ernment's failure to allow Transohio Savings to recognize $157.5 million of capital credit and supervisory goodwill as an asset towards regulatory net worth. See TR at 2739–47, 2760, 2771–74 (Cook testifying about relationship between losses in mortgage banking and the breach). Moreover, Dr. Hamm did not establish any cause and effect between any lower interest rates and the $15 million in mortgage banking losses other than the generalized observation as to "what Mr. Greenspan and the Federal Reserve Board of Governors did in terms of moving interest rates down at the time." TR at 3025. Therefore, the Government's motion for reconsideration of the $15 million amortization losses in fiscal year 1991 is denied, because the Government did not meet its burden of proof to establish with reasonable certainty that these specific losses would have been incurred by Transohio Savings irrespective of the breach. See RESTATEMENT § 349. The court's Final Decision also will incorporate this additional reasoning to further clarify this point.

■ In addition, the Government seeks reconsideration of $9.7 million of $26.9 million losses on mortgage backed and related securities because certain interest only strip securities "were written down ... so that the recorded balance would not exceed the undiscounted estimated future cash flows." 2/25/05 Gov't Mot. to Reconsider at 10 (citing DX 613 at WON537 2236) (Transohio Savings Form 10–K for fiscal year ending December 31, 1991).[4] The Government asserts that Mr. Larry Johnson, one of the Government's experts, testified that the "write down was related to a generally accepted accounting principles ('GAAP') rule, not to either the breach or the shrinkage." 2/25/05 Gov't Mot. to Reconsider at 10 (citing TR at 2152–54). The I/O losses, however, like the $38.9 million of loan losses were not actual economic out-of-pocket losses, but accounting entries. Moreover, the court disclosed that Transohio

---

4. The Government apparently does not dispute that at least $17.2 million of the mortgage derivative losses for fiscal year 1991 were caused by the breach. Compare American Capital III, 63 Fed.Cl. at 709–10 (determining that the Government did not establish with reasonable certainty that $26.7 million in losses on mortgage derivatives would have been incurred by Trans-

ohio Savings irrespective of the breach) with 2/25/05 Gov't Mot. to Reconsider at 10 (citing DX 613 at 46) ("[A]t least $9.7 million of Transohio's 1991 loss on mortgage derivatives resulted when certain interest only [("I/O")] strips became permanently impaired because their previously recorded balance 'exceed[ed] the undiscounted estimated future cash flows.' ").

Savings' former CEO, Mr. Wooldredge, testified that the recording of the I/O strips at the lower of the cost or market "would not be a direct cost of the breach." *American Capital III*, 63 Fed.Cl. at 710 (citing TR at 2557). The court indicated, however, that it found an October 23, 1991 memorandum more persuasive evidence, reflecting that OTS required Transohio Savings to sell the I/O strips because "Transohio's actions over the past two years in reducing the size of the portfolio and replacing fixed rate MBS with variable rate securities appears to have eliminated the hedge[.]" *Id.* (citing DX 585 at WOL235 0355). The nexus between the 1989 breach and the 1991 $9.7 million of I/O losses could not be clearer, because the I/O losses resulted from shrinkage. Therefore, the Government's Motion for Reconsideration of the $9.7 million losses in fiscal year 1991 is denied, because the Government did not meet its burden of proof. *See* RESTATEMENT § 349. The court's Final Decision also will incorporate this additional reasoning to further clarify this point.

Third, the Government challenges the court's determination that the relevant RESTATEMENT § 349 losses occurred in 1989–1991, but not in 1992. *See* 2/25/05 Gov't Mot. to Reconsider at 10–11. As discussed at length in *American Capital II*, 59 Fed.Cl. at 584–85, *American Capital III*, 63 Fed.Cl. at 712, and herein, the Government has the burden of proof to establish with reasonable certainty those losses that Transohio Savings would have incurred irrespective of the breach. *See* RESTATEMENT § 349. The court recognized that Transohio Savings incurred $13 million of net losses during the first half of fiscal 1992. *See American Capital III*, 63 Fed.Cl. at 711. Because Transohio Savings in effect was subject to the control of the regulators by that time, the court determined that the particular facts and circumstances of this case made it exceedingly difficult to ascertain the cause of the 1992 losses with any degree of reasonable certainty. *Id.* at 711–12. Indeed, the Government admitted as much at the post hearing argument as did the Government's expert, Dr. Hamm. *Id.* at 711–12 (citing the TR at 3173–74). Therefore, the Government's suggestion that the court "limit[ed] temporally our ability to

show that losses were unconnected to the breach" is somewhat disingenuous. *See* 2/25/05 Gov't Mot. to Reconsider at 10–11. As the record shows, the Government was not precluded from proffering any evidence that it wanted to introduce at any time nor was it limited in argument or in briefs regarding the 1992 losses or otherwise. Accordingly, the Government's February 25, 2005 Motion for Reconsideration of the court's determination that the relevant RESTATEMENT § 349 losses in this case occurred in 1989–1991 is denied.

Fourth, the Government argues that the court erred "in declining to determine whether Transohio would have failed regardless of the breach." *See* 2/25/05 Gov't Mot. to Reconsider at 11. As a matter of law, that issue is irrelevant. For the same reason, the court also continues to decline plaintiffs' invitation for the court to determine that Transohio Savings would not have been seized absent the breach. *See* Pl. Resp. at 19; *see also American Capital III*, 63 Fed.Cl. at 685. The relevant inquiry is: whether plaintiffs and the Government had a contract; whether the contract was breached; whether the breach caused any of the plaintiffs to incur losses, minus any losses that should be deducted, as determined by RESTATEMENT § 349. In this case, the court first determined that plaintiffs and the Government had a contract and the Government breached essential terms of that contract. *See* in *American Capital I*, 58 Fed.Cl. at 409. Next, the court determined that the breach caused losses in the amount of plaintiff TFC's essential and collateral reliance interests. *See American Capital II*, 59 Fed.Cl. at 580–84. Finally, the court determined that the Government established with reasonable certainty that specific losses of $50.336 million should be deducted from a final award, because these losses would have been incurred by Transohio Savings irrespective of the breach. *See American Capital III*, 63 Fed.Cl. at 715. Accordingly, the Government's February 25, 2005 Motion for Reconsideration regarding whether Transohio Savings would have failed regardless of the breach is irrelevant and denied.

## C. The Relevance Of *California Federal Bank v. United States*, 395 F.3d 1263 (Fed.Cir.2005).

On January 19, 2005, the same day the court issued *American Capital III*, the United States Court of Appeals for the Federal Circuit issued a decision in *California Federal Bank v. United States*, 395 F.3d 1263 (Fed.Cir.2005), affirming a trial court's determination that the plaintiff in that case failed to meet its burden of proof to show that the Government's breach of a contractual promise to treat "supervisory goodwill" as part of regulatory capital caused plaintiff to sell certain adjustable rate mortgages from which it could have earned substantial profits. The Federal Circuit noted therein that the trial court held that the standard of causation for lost profits must "inevitably and naturally, not possibly nor even probably" flow from defendant's breach. *Id.* at 1267 (quoting *Myerle v. United States*, 33 Ct.Cl. 1, 27, 1800 WL 2024 (1897)). On appeal, plaintiff-appellant argued that the proper standard of causation for lost profits required only that the breach be a "substantial factor" contributing to the loss, citing *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir.2001) ("*Bluebonnet Savings Bank*"). The United States Court of Appeals for the Federal Circuit did not adopt either of these proposed standards, but instead read *Bluebonnet Savings Bank* to hold only that the "causal connection between the breach and the loss of profits must be '*definitely established*' [to ensure] that the non-breaching party will not be awarded more than it would have received if the contract had been performed." *California Federal Bank*, 395 F.3d at 1268 (emphasis added) (citations omitted).[5] In addition, the Federal Circuit emphasized that the breach need not be the "*sole factor or sole cause*" of the loss of profits. *Id.* (emphasis added). Indeed, "other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.*

In this case, the Government argued on reconsideration that because "the Court, in its Opinion, relied upon the 'less exacting' version of the substantial factor standard now rejected by the Federal Circuit, [*California Federal Bank*, 395 F.3d] at 1267, and because the Court did not find that plaintiffs 'definitely established' that the breach caused the loss of either their 'essential' or 'collateral' reliance interests, any judgment in favor of plaintiffs in this case cannot be reconciled with *CalFed*." 2/25/05 Gov't Mot. to Reconsider at 12. Accordingly, the Government requests that the court "vacate [the January 19, 2005] Opinion in light of the Federal Circuit's decision in *CalFed.*" *Id.* at 20. No opinion of the United States Court of Appeals for the Federal Circuit has spoken directly to the issue of whether the proper standard of causation in a breach of contract case for expectancy damages is different from the standard to be applied in a case seeking damages based on reliance interests. Therefore, one could argue, as plaintiffs have, that the decision in *California Federal Bank* is limited only to cases where lost profits are claimed and therefore has no applicability in this case. *See* Pl. Resp. at 4.

The court, however, views the holding of *California Federal Bank* that a "causal connection between the breach and the loss of profits must be definitely established" is neither inconsistent nor incompatible and the court's determination in this case that a causal connection between the breach and loss of reliance interest was both foreseeable and certain. *See American Capital II*, 59 Fed. Cl. at 575–76; *American Capital III*, 63 Fed. Cl. at 712–13. The Government argues that "the Court appears to have adopted an approach that equates the causation requirement with the foreseeability requirement." 2/25/05 Gov't Mot. to Reconsider at 19 (citing *American Capital III*, 63 Fed.Cl. at 712) (quoting ARTHUR L. CORBIN, CORBIN ON CONTRACTS §§ 1006, 1007 at 60–61 (interim ed. 2002) ("Our only test of 'causation,' ... is

5. The Government mistakenly stated that "the Federal Circuit held" and adopted the language of *Myerle*. *See* 2/25/05 Gov't Mot. to Reconsider at 13 (citing to *California Federal Bank*, 395 F.3d at 1267). The decision is quite clear that it was the trial court that was urging the *Myerle* language. Instead, the Federal Circuit endorsed a different standard, *i.e.*, "the causal connection between the breach and the loss ... must be 'definitely established.'" *California Federal Bank*, 395 F.3d at 1268 (citing cases other than *Myerle*).

foreseeability[.]")). The Government thus concludes that "to the extent the Court in the present case collapsed the causation analysis into its foreseeability analysis, that approach is incompatible with *CalFed*." 2/25/05 Gov't Mot. to Reconsider at 20. The Government fails to appreciate that for causation to be "definitely established," *i.e.*, "directly and primarily" and "inevitably and naturally, not possibly or probably," both foreseeability and certainty must be established, as plaintiffs have done in this case, and the court so held.

As *California Federal Bank* further explained, the purpose of "definitely establish[ing]" a causal connection between the breach and loss is so the non-breaching party will not be awarded more than if the contract had been performed. In this case, the court's determination that TFC is entitled to a damage award of $109.309 million meets the "definitely established" standard in that the award does not exceed the Government's contractual promise that Transohio Savings could treat the $157.5 million capital credit and supervisory goodwill as an asset towards meeting its net worth requirement, for which plaintiff, TFC, contributed its equity in Transohio Savings with a book value of $126.479 million and authorized an additional $42.166 million in equity. In making this determination, the court did not "rel[y] upon the 'less exacting' version of the substantial factor standard[.]" *See* 2/25/05 Gov't Mot. Reconsider at 12. Instead, the court followed the rule that "the requirement of foreseeability is a more severe limitation than is the requirement of substantial or 'proximate cause' in the case of an action in tort or for breach of warranty[.]" *See American Capital III*, 63 Fed.Cl. at 712–13 (citing RESTATEMENT § 351(1) and cmt. a). The court's final decision also will incorporate this reasoning to evidence consideration of *California Federal Bank*.

## CONCLUSION

For the aforegoing reasons, the Government's November 17, 2003 Motion for Reconsideration is denied; the Government's March 12, 2004 Motion for Reconsideration is granted in part and denied in part; and the Government's February 25, 2005 Motion for Reconsideration is granted in part and denied in part.

Plaintiffs will advise the Government and the court no later than May 6, 2005 whether the pending claims brought under the Just Compensation Clause of the Fifth Amendment to the United States Constitution should be set for trial or voluntarily dismissed, without prejudice.

**IT IS SO ORDERED.**